377 U.S. 533 (1964)
REYNOLDS, JUDGE, ET AL.
v.
SIMS ET AL.
No. 23.
Supreme Court of United States.
Argued November 13, 1963.
Decided June 15, 1964.[*]
APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA.
*536 W. McLean Pitts argued the cause for appellants in No. 23 and for appellees in Nos. 27 and 41. With him on the briefs were Joseph E. Wilkinson, Jr. and Thomas G. Gayle.
David J. Vann argued the cause for appellants in No. 27. With him on the brief were Robert S. Vance and C. H. Erskine Smith.
John W. McConnell, Jr. argued the cause and filed a brief for appellants in No. 41.
Appellee Richmond M. Flowers, Attorney General of Alabama, argued the cause pro se. With him on the brief was Gordon Madison, Assistant Attorney General.
Charles Morgan, Jr. argued the cause for appellees in No. 23. With him on the brief for appellees Sims et al. was George Peach Taylor. Jerome A. Cooper filed a brief for appellees Farr et al.
Solicitor General Cox, by special leave of Court, argued the cause for the United States, as amicus curiae, urging affirmance. With him on the brief were Bruce J. Terris and Richard W. Schmude.
Briefs of amici curiae were filed by Leo Pfeffer, Melvin L. Wulf, Jack Greenberg and Robert B. McKay for the American Jewish Congress et al., and by W. Scott Miller, Jr. and George J. Long for Schmied. President of the Board of Aldermen of Louisville, Kentucky.
MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.
Involved in these cases are an appeal and two cross-appeals from a decision of the Federal District Court for the Middle District of Alabama holding invalid, under *537 the Equal Protection Clause of the Federal Constitution, the existing and two legislatively proposed plans for the apportionment of seats in the two houses of the Alabama Legislature, and ordering into effect a temporary reapportionment plan comprised of parts of the proposed but judicially disapproved measures.[1]

I.
On August 26, 1961, the original plaintiffs (appellees in No. 23), residents, taxpayers and voters of Jefferson County, Alabama, filed a complaint in the United States District Court for the Middle District of Alabama, in their own behalf and on behalf of all similarly situated Alabama voters, challenging the apportionment of the Alabama Legislature. Defendants below (appellants in No. 23), sued in their representative capacities, were various state and political party officials charged with the performance of certain duties in connection with state elections.[2] The complaint alleged a deprivation of rights under the Alabama Constitution and under the Equal Protection Clause of the Fourteenth Amendment, and asserted that the District Court had jurisdiction under provisions of the Civil Rights Act. 42 U. S. C. งง 1983. 1988, as well as under 28 U. S. C. งง 1343 (3).
The complaint stated that the Alabama Legislature was composed of a Senate of 35 members and a House of Representatives of 106 members. It set out relevant portions of the 1901 Alabama Constitution, which prescribe the number of members of the two bodies of the *538 State Legislature and the method of apportioning the seats among the State's 67 counties, and provide as follows:
Art. IV, Sec. 50. "The legislature shall consist of not more than thirty-five senators, and not more than one hundred and five members of the house of representatives, to be apportioned among the several districts and counties, as prescribed in this Constitution; provided that in addition to the above number of representatives, each new county hereafter created shall be entitled to one representative."
Art. IX, Sec. 197. "The whole number of senators shall be not less than one-fourth or more than one-third of the whole number of representatives."
Art. IX, Sec. 198. "The house of representatives shall consist of not more than one hundred and five members, unless new counties shall be created, in which event each new county shall be entitled to one representative. The members of the house of representatives shall be apportioned by the legislature among the several counties of the state, according to the number of inhabitants in them, respectively, as ascertained by the decennial census of the United States, which apportionment, when made, shall not be subject to alteration until the next session of the legislature after the next decennial census of the United States shall have been taken."
Art. IX, Sec. 199. "It shall be the duty of the legislature at its first session after the taking of the decennial census of the United States in the year nineteen hundred and ten, and after each subsequent decennial census, to fix by law the number of representatives and apportion them among the several counties of the state, according to the number of inhabitants in them, respectively; provided, that *539 each county shall be entitled to at least one representative."
Art. IX, Sec. 200. "It shall be the duty of the legislature at its first session after taking of the decennial census of the United States in the year nineteen hundred and ten, and after each subsequent decennial census, to fix by law the number of senators, and to divide the state into as many senatorial districts as there are senators, which districts shall be as nearly equal to each other in the number of inhabitants as may be, and each shall be entitled to one senator, and no more; and such districts, when formed, shall not be changed until the next apportioning session of the legislature, after the next decennial census of the United States shall have been taken; provided, that counties created after the next preceding apportioning session of the legislature may be attached to senatorial districts. No county shall be divided between two districts, and no district shall be made up of two or more counties not contiguous to each other."
Art. XVIII, Sec. 284. ". . . Representation in the legislature shall be based upon population, and such basis of representation shall not be changed by constitutional amendments."
The maximum size of the Alabama House was increased from 105 to 106 with the creation of a new county in 1903, pursuant to the constitutional provision which states that, in addition to the prescribed 105 House seats, each county thereafter created shall be entitled to one representative. Article IX, งง 202 and 203, of the Alabama Constitution established precisely the boundaries of the State's senatorial and representative districts until the enactment of a new reapportionment plan by the legislature. These 1901 constitutional provisions, specifically describing the composition of the senatorial *540 districts and detailing the number of House seats allocated to each county, were periodically enacted as statutory measures by the Alabama Legislature, as modified only by the creation of an additional county in 1903, and provided the plan of legislative apportionment existing at the time this litigation was commenced.[3]
Plaintiffs below alleged that the last apportionment of the Alabama Legislature was based on the 1900 federal census, despite the requirement of the State Constitution that the legislature be reapportioned decennially. They asserted that, since the population growth in the State from 1900 to 1960 had been uneven, Jefferson and other counties were now victims of serious discrimination with respect to the allocation of legislative representation. As a result of the failure of the legislature to reapportion itself, plaintiffs asserted, they were denied "equal suffrage in free and equal elections . . . and the equal protection of the laws" in violation of the Alabama Constitution and the Fourteenth Amendment to the Federal Constitution. The complaint asserted that plaintiffs had no other adequate remedy, and that they had exhausted all forms of relief other than that available through the federal courts. They alleged that the Alabama Legislature had established a pattern of prolonged inaction from 1911 to the present which "clearly demonstrates that no reapportionment. . . shall be effected"; that representation at any future constitutional convention would be established by the legislature, making it unlikely that the membership of any such convention would be fairly representative; and that, while the Alabama Supreme Court had found that the legislature had not complied with the State Constitution in failing to reapportion according *541 to population decennially,[4] that court had nevertheless indicated that it would not interfere with matters of legislative reapportionment.[5]
Plaintiffs requested that a three-judge District Court be convened.[6] With respect to relief, they sought a declaration that the existing constitutional and statutory provisions, establishing the present apportionment of seats in the Alabama Legislature, were unconstitutional under the Alabama and Federal Constitutions, and an injunction against the holding of future elections for legislators until the legislature reapportioned itself in accordance, with the State Constitution. They further requested the issuance of a mandatory injunction, effective until such time as the legislature properly reapportioned, requiring the conducting of the 1962 election for legislators at large over the entire State, and any other relief which "may seem just, equitable and proper."
A three-judge District Court was convened, and three groups of voters, taxpayers and residents of Jefferson, Mobile, and Etowah Counties were permitted to intervene *542 in the action as intervenor-plaintiffs. Two of the groups are cross-appellants in Nos. 27 and 41. With minor exceptions, all of the intervenors adopted the allegations of and sought the same relief as the original plaintiffs.
On March 29, 1962, just three days after this Court had decided Baker v. Carr, 369 U. S. 186, plaintiffs moved for a preliminary injunction requiring defendants to conduct at large the May 1962 Democratic primary election and the November 1962 general election for members of the Alabama Legislature. The District Court set the motion for hearing in an order stating its tentative views that an injunction was not required before the May 1962 primary election to protect plaintiffs' constitutional rights, and that the Court should take no action which was not "absolutely essential" for the protection of the asserted constitutional rights before the Alabama Legislature had had a "further reasonable but prompt opportunity to comply with its duty" under the Alabama Constitution.
On April 14, 1962, the District Court, after reiterating the views expressed in its earlier order, reset the case for hearing on July 16, noting that the importance of the case, together with the necessity for effective action within a limited period of time, required an early announcement of its views. 205 F. Supp. 245. Relying on our decision in Baker v. Carr, the Court found jurisdiction, justiciability and standing. It stated that it was taking judicial notice of the facts that there had been population changes in Alabama's counties since 1901, that the present representation in the State Legislature was not on a population basis, and that the legislature had never reapportioned its membership as required by the Alabama Constitution.[7] Continuing, the Court stated *543 that if the legislature complied with the Alabama constitutional provision requiring legislative representation to be based on population there could be no objection on federal constitutional grounds to such an apportionment. The Court further indicated that, if the legislature failed to act, or if its actions did not meet constitutional standards, it would be under a "clear duty" to take some action on the matter prior to the November 1962 general election. The District Court stated that its "present thinking" was to follow an approach suggested by MR. JUSTICE CLARK in his concurring opinion in Baker v. Carr[8]โ awarding seats released by the consolidation or revamping of existing districts to counties suffering "the most egregious discrimination," thereby releasing the strangle hold on the legislature sufficiently so as to permit the newly elected body to enact a constitutionally valid and permanent reapportionment plan, and allowing eventual dismissal of the case. Subsequently, plaintiffs were permitted to amend their complaint by adding a further prayer for relief, which asked the District Court to reapportion the Alabama Legislature provisionally so that the rural strangle hold would be relaxed enough to permit it to reapportion itself.
On July 12, 1962, an extraordinary session of the Alabama Legislature adopted two reapportionment plans to take effect for the 1966 elections. One was a proposed constitutional amendment, referred to as the "67-Senator Amendment."[9] It provided for a House of Representatives consisting of 106 members, apportioned by giving *544 one seat to each of Alabama's 67 counties and distributing the others according to population by the "equal proportions" method.[10] Using this formula, the constitutional amendment specified the number of representatives allotted to each county until a new apportionment could be made on the basis of the 1970 census. The Senate was to be composed of 67 members, one from each county. The legislation provided that the proposed amendment should be submitted to the voters for ratification at the November 1962 general election.
The other reapportionment plan was embodied in a statutory measure adopted by the legislature and signed into law by the Alabama Governor, and was referred to as the "Crawford-Webb Act."[11] It was enacted as standby legislation to take effect in 1966 if the proposed constitutional amendment should fail of passage by a majority of the State's voters, or should the federal courts refuse to accept the proposed amendment (though not rejected by the voters) as effective action in compliance with the requirements of the Fourteenth Amendment. The act provided for a Senate consisting of 35 members, representing 35 senatorial districts established along county lines, and altered only a few of the former districts. In apportioning the 106 seats in the Alabama House of Representatives, the statutory measure gave each county one seat, and apportioned the remaining 39 on a rough population basis, under a formula requiring increasingly more population for a county to be accorded *545 additional seats. The Crawford-Webb Act also provided that it would be effective "until the legislature is reapportioned according to law," but provided no standards for such a reapportionment. Future apportionments would presumably be based on the existing provisions of the Alabama Constitution which the statute, unlike the proposed constitutional amendment, would not affect.
The evidence adduced at trial before the three-judge panel consisted primarily of figures showing the population of each Alabama county and senatorial district according to the 1960 census, and the number of representatives allocated to each county under each of the three plans at issue in the litigationโthe existing apportionment (under the 1901 constitutional provisions and the current statutory measures substantially reenacting the same plan), the proposed 67-Senator constitutional amendment, and the Crawford-Webb Act. Under all three plans, each senatorial district would be represented by only one senator.
On July 21, 1962, the District Court held that the inequality of the existing representation in the Alabama Legislature violated the Equal Protection Clause of the Fourteenth Amendment, a finding which the Court noted had been "generally conceded" by the parties to the litigation, since population growth and shifts had converted the 1901 scheme, as perpetuated some 60 years later, into an invidiously discriminatory plan completely lacking in rationality. 208 F. Supp. 431. Under the existing provisions, applying 1960 census figures, only 25.1% of the State's total population resided in districts represented by a majority of the members of the Senate, and only 25.7% lived in counties which could elect a majority of the members of the House of Representatives. Population-variance ratios of up to about 41-to-1 existed in the Senate, and up to about 16-to-1 in the House. Bullock County, with a population of only 13,462, and Henry County, with a population of only 15,286, each were allocated two seats *546 in the Alabama House, whereas Mobile County, with a population of 314,301, was given only three seats, and Jefferson County, with 634,864 people, had only seven representatives.[12] With respect to senatorial apportionment, since the pertinent Alabama constitutional provisions had been consistently construed as prohibiting the giving of more than one Senate seat to any one county,[13] Jefferson County, with over 600,000 people, was given only one senator, as was Lowndes County, with a 1960 population of only 15,417, and Wilcox County, with only 18,739 people.[14]
The Court then considered both the proposed constitutional amendment and the Crawford-Webb Act to ascertain *547 whether the legislature had taken effective action to remedy the unconstitutional aspects of the existing apportionment. In initially summarizing the result which it had reached, the Court stated;
"This Court has reached the conclusion that neither the 67-Senator Amendment,' nor the `Crawford-Webb Act' meets the necessary constitutional requirements. We find that each of the legislative acts, when considered as a whole, is so obviously discriminatory, arbitrary and irrational that it becomes unnecessary to pursue a detailed development of each of the relevant factors of the [federal constitutional] test."[15]
The Court stated that the apportionment of one senator to each county, under the proposed constitutional amendment, would "make the discrimination in the Senate even more invidious than at present." Under the 67-Senator Amendment, as pointed out by the court below, "[t]he present control of the Senate by members representing 25.1% of the people of Alabama would be reduced to control by members representing 19.4% of the people of the State," the 34 smallest counties, with a total population of less than that of Jefferson County, would have a majority of the senatorial seats, and senators elected by only about 14% of the State's population could prevent the submission to the electorate of any future proposals to amend the State Constitution (since a vote of two-fifths of the members of one house can defeat a proposal to amend the Alabama Constitution). Noting that the "only conceivable rationalization" of the senatorial apportionment scheme is that it was based on equal representation of political subdivisions within the State and is thus analogous to the Federal Senate, the District Court rejected the analogy on the ground that Alabama *548 counties are merely involuntary political units of the State created by statute to aid in the administration of state government. In finding the so-called federal analogy irrelevant, the District Court stated:
"The analogy cannot survive the most superficial examination into the history of the requirement of the Federal Constitution and the diametrically opposing history of the requirement of the Alabama Constitution that representation shall be based on population. Nor can it survive a comparison of the different political natures of states and counties."[16]
The Court also noted that the senatorial apportionment proposal "may not have complied with the State Constitution," since not only is it explicitly provided that the population basis of legislative representation "shall not be changed by constitutional amendments,"[17] but the Alabama Supreme Court had previously indicated that that requirement could probably be altered only by constitutional convention.[18] The Court concluded, however, that the apportionment of seats in the Alabama House, under the proposed constitutional amendment, was "based upon reason, with a rational regard for known and accepted *549 standards of apportionment."[19] Under the proposed apportionment of representatives, each of the 67 counties was given one seat and the remaining 39 were allocated on a population basis. About 43% of the State's total population would live in counties which could elect a majority in that body. And, under the provisions of the 67-Senator Amendment, while the maximum population-variance ratio was increased to about 59-to-1 in the Senate, it was significantly reduced to about 4.7-to-1 in the House of Representatives. Jefferson County was given 17 House seats, an addition of 10, and Mobile County was allotted eight, an increase of five. The increased representation of the urban counties was achieved primarily by limiting the State's 55 least populous counties to one House seat each, and the net effect was to take 19 seats away from rural counties and allocate them to the more populous counties. Even so, serious disparities from a population-based standard remained. Montgomery County, with 169,210 people, was given only four seats, while Coosa County, with a population of only 10,726, and Cleburne County, with only 10,911, were each allocated one representative.
Turning next to the provisions of the Crawford-Webb Act, the District Court found that its apportionment of the 106 seats in the Alabama House of Representatives, by allocating one seat to each county and distributing the remaining 39 to the more populous counties in diminishing ratio to their populations, was "totally unacceptable."[20] Under this plan, about 37% of the State's total *550 population would reside in counties electing a majority of the members of the Alabama House, with a maximum population-variance ratio of about 5-to-1. Each representative from Jefferson and Mobile Counties would represent over 52,000 persons while representatives from eight rural counties would each represent less than 20,000 people. The Court regarded the senatorial apportionment provided in the Crawford-Webb Act as "a step in the right direction, but an extremely short step," and but a "slight improvement over the present system of representation."[21] The net effect of combining a few of the less populous counties into two-county, districts and splitting up several of the larger districts into smaller ones would be merely to increase the minority which would be represented by a majority of the members of the Senate from 25.1% to only 27.6% of the State's population.[22] The Court pointed out that, under the Crawford-Webb Act, the vote of a person in the senatorial district consisting of Bibb and Perry Counties would be worth 20 times that of a citizen in Jefferson County, and that the vote of a citizen in the six smallest districts would be worth 15 or more times that of a Jefferson County voter. The Court concluded that the Crawford-Webb *551 Act was "totally unacceptable" as a "piece of permanent legislation" which, under the Alabama Constitution, would have remained in effect without alteration at least until after the next decennial census.
Under the detailed requirements of the various constitutional provisions relating to the apportionment of seats in the Alabama Senate and House of Representatives, the Court found, the membership of neither house can be apportioned solely on a population basis, despite the provision in Art. XVIII, ง 284, which states that "[r]epresentation in the legislature shall be based upon population." In dealing with the conflicting and somewhat paradoxical requirements (under which the number of seats in the House is limited to 106 but each of the 67 counties is required to be given at least one representative, and the size of the Senate is limited to 35 but it is required to have at least one-fourth of the members of the House, although no county can be given more than one senator), the District Court stated its view that "the controlling or dominant provision of the Alabama Constitution on the subject of representation in the Legislature" is the previously referred to language of ง 284. The Court stated that the detailed requirements of Art. IX, งง 197-200,
"make it obvious that in neither the House nor the Senate can representation be based strictly and entirely upon population. . . . The result may well be that representation according to population to some extent must be required in both Houses if invidious discrimination in the legislative systems as a whole is to be avoided. Indeed, . . . it is the policy and theme of the Alabama Constitution to require representation according to population in both Houses as nearly as may be, while still complying with more detailed provisions."[23]
*552 The District Court then directed its concern to the providing of an effective remedy. It indicated that it was adopting and ordering into effect for the November 1962 election a provisional and temporary reapportionment plan composed of the provisions relating to the House of Representatives contained in the 67-Senator Amendment and the provisions of the Crawford-Webb Act relating to the Senate. The Court noted, however, that "[t]he proposed reapportionment of the Senate in the `Crawford-Webb Act,' unacceptable as a piece of permanent legislation, may not even break the strangle hold." Stating that it was retaining jurisdiction and deferring any hearing on plaintiffs' motion for a permanent injunction "until the Legislature, as provisionally reapportioned . . . , has an opportunity to provide for a true reapportionment of both Houses of the Alabama Legislature," the Court emphasized that its "moderate" action was designed to break the strangle hold by the smaller counties on the Alabama Legislature and would not suffice as a permanent reapportionment. On July 25, 1962, the Court entered its decree in accordance with its previously stated determinations, concluding that "plaintiffs. . . are denied . . . equal protection . . . by virtue of the debasement of their votes since the Legislature of the State of Alabama has failed and continues to fail to reapportion itself as required by law." It enjoined the defendant state officials from holding any future elections under any of the apportionment plans that it had found invalid, and stated that the 1962 election of Alabama legislators could validly be conducted only under the apportionment scheme specified in the Court's order.
After the District Court's decision, new primary elections were held pursuant to legislation enacted in 1962 at the same special session as the proposed constitutional amendment and the Crawford-Webb Act, to be effective *553 in the event the Court itself ordered a particular reapportionment plan into immediate effect. The November 1962 general election was likewise conducted on the basis of the District Court's ordered apportionment of legislative seats, as MR. JUSTICE BLACK refused to stay the District Court's order. Consequently, the present Alabama Legislature is apportioned in accordance with the temporary plan prescribed by the District Court's decree. All members of both houses of the Alabama Legislature serve four-year terms, so that the next regularly scheduled election of legislators will not be held until 1966. The 1963 regular session of the Alabama Legislature produced no legislation relating to legislative apportionment,[24] and the legislature, which meets biennially, will not hold another regular session until 1965.
No effective political remedy to obtain relief against the alleged malapportionment of the Alabama Legislature appears to have been available.[25] No initiative procedure exists under Alabama law. Amendment of the State Constitution can be achieved only after a proposal is adopted by three-fifths of the members of both houses of the legislature and is approved by a majority of the people,[26] or as a result of a constitutional convention convened *554 after approval by the people of a convention call initiated by a majority of both houses of the Alabama Legislature.[27]
Notices of appeal to this Court from the District Court's decision were timely filed by defendants below (appellants in No. 23) and by two groups of intervenor-plaintiffs (cross-appellants in Nos. 27 and 41). Appellants in No. 23 contend that the District Court erred in holding the existing and the two proposed plans for the apportionment of seats in the Alabama Legislature unconstitutional, and that a federal court lacks the power to affirmatively reapportion seats in a state legislature. Cross-appellants in No. 27 assert that the court below erred in failing to compel reapportionment of the Alabama Senate on a population basis as allegedly required by the Alabama Constitution and the Equal Protection Clause of the Federal Constitution. Cross-appellants in No. 41 contend that the District Court should have required and ordered into effect the apportionment of seats in both houses of the Alabama Legislature on a population basis. We noted probable jurisdiction on June 10, 1963. 374 U. S. 802.

II.
Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections. A consistent line of decisions by this Court in cases involving attempts to deny or restrict the right of suffrage has made this indelibly clear. It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, Ex parte Yarbrough, 110 U. S. 651, and to have their votes counted, United States v. Mosley, 238 U. S. 383. In Mosley the Court stated that it is "as equally unquestionable that the right to have one's vote counted is as open to protection. . . as the right to put a ballot in a box." 238 U. S., *555 at 386. The right to vote can neither be denied outright, Guinn v. United States, 238 U. S. 347, Lane v. Wilson, 307 U. S. 268, nor destroyed by alteration of ballots, see United States v. Classic, 313 U. S. 299, 315, nor diluted by ballot-box stuffing, Ex parte Siebold, 100 U. S. 371, United States v. Saylor, 322 U. S. 385. As the Court stated in Classic, "Obviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted . . . ." 313 U. S., at 315. Racially based gerrymandering, Gomillion v. Lightfoot, 364 U. S. 339, and the conducting of white primaries, Nixon v. Herndon, 273 U. S. 536, Nixon v. Condon, 286 U. S. 73, Smith v. Allwright, 321 U. S. 649, Terry v. Adams, 345 U. S. 461, both of which result in denying to some citizens their right to vote, have been held to be constitutionally impermissible. And history has seen a continuing expansion of the scope of the right of suffrage in this country.[28] The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.[29]
*556 In Baker v. Carr, 369 U. S. 186, we held that a claim asserted under the Equal Protection Clause challenging the constitutionality of a State's apportionment of seats in its legislature, on the ground that the right to vote of certain citizens was effectively impaired since debased and diluted, in effect presented a justiciable controversy subject to adjudication by federal courts. The spate of similar cases filed and decided by lower courts since our decision in Baker amply shows that the problem of state legislative malapportionment is one that is perceived to exist in a large number of the States.[30] In Baker, a suit involving an attack on the apportionment of seats in the Tennessee Legislature, we remanded to the District Court, which had dismissed the action, for consideration on the merits. We intimated no view as to the proper constitutional standards for evaluating the validity of a state legislative apportionment scheme. Nor did we give any consideration to the question of appropriate remedies. Rather, we simply stated:
"Beyond noting that we have no cause at this stage to doubt the District Court will be able to fashion relief if violations of constitutional rights are found, it is improper now to consider what remedy would be most appropriate if appellants prevail at the trial."[31]
*557 We indicated in Baker, however, that the Equal Protection Clause provides discoverable and manageable standards for use by lower courts in determining the constitutionality of a state legislative apportionment scheme, and we stated:
"Nor need the appellants, in order to succeed in this action, ask the Court to enter upon policy determinations for which judicially manageable standards are lacking. Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects no policy, but simply arbitrary and capricious action."[32]
Subsequent to Baker, we remanded several cases to the courts below for reconsideration in light of that decision.[33]
In Gray v. Sanders, 372 U. S. 368, we held that the Georgia county unit system, applicable in statewide primary elections, was unconstitutional since it resulted in a dilution of the weight of the votes of certain Georgia voters merely because of where they resided. After indicating that the Fifteenth and Nineteenth Amendments prohibit a State from overweighting or diluting votes on the basis of race or sex, we stated:
"How then can one person be given twice or ten times the voting power of another person in a statewide election merely because he lives in a rural area or because he lives in the smallest rural county? Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal voteโwhatever their race, whatever their sex, whatever their occupation, *558 whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment. The concept of `we the people' under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications. The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of our decisions."[34]
Continuing, we stated that "there is no indication in the Constitution that homesite or occupation affords a permissible basis for distinguishing between qualified voters within the State." And, finally, we concluded: "The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thingโone person, one vote."[35]
We stated in Gray, however, that that case,
"unlike Baker v. Carr, . . . does not involve a question of the degree to which the Equal Protection Clause of the Fourteenth Amendment limits the authority of a State Legislature in designing the geographical districts from which representatives are chosen either for the State Legislature or for the Federal House of Representatives. . . . Nor does it present the question, inherent in the bicameral form of our Federal Government, whether a State may have one house chosen without regard to population."[36]
*559 Of course, in these cases we are faced with the problem not presented in Grayโthat of determining the basic standards and stating the applicable guidelines for implementing our decision in Baker v. Carr.
In Wesberry v. Sanders, 376 U. S. 1, decided earlier this Term, we held that attacks on the constitutionality of congressional districting plans enacted by state legislatures do not present nonjusticiable questions and should not be dismissed generally for "want of equity." We determined that the constitutional test for the validity of congressional districting schemes was one of substantial equality of population among the various districts established by a state legislature for the election of members of the Federal House of Representatives.
In that case we decided that an apportionment of congressional seats which "contracts the value of some votes and expands that of others" is unconstitutional, since "the Federal Constitution intends that when qualified voters elect members of Congress each vote be given as much weight as any other vote . . . ." We concluded that the constitutional prescription for election of members of the House of Representatives "by the People," construed in its historical context, "means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." We further stated:
"It would defeat the principle solemnly embodied in the Great Compromiseโequal representation in the House for equal numbers of peopleโfor us to hold that, within the States, legislatures may draw the lines of congressional districts in such a way as to give some voters a greater voice in choosing a Congressman than others."[37]
We found further, in Wesberry, that "our Constitution's plain objective" was that "of making equal representation *560 for equal numbers of people the fundamental goal . . . ." We concluded by stating:
"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right."[38]
Gray and Wesberry are of course not dispositive of or directly controlling on our decision in these cases involving state legislative apportionment controversies. Admittedly, those decisions, in which we held that, in statewide and in congressional elections, one person's vote must be counted equally with those of all other voters in a State, were based on different constitutional considerations and were addressed to rather distinct problems. But neither are they wholly inapposite. Gray, though not determinative here since involving the weighting of votes in statewide elections, established the basic principle of equality among voters within a State, and held that voters cannot be classified, constitutionally, on the basis of where they live, at least with respect to voting in statewide elections. And our decision in Wesberry was of course grounded on that language of the Constitution which prescribes that members of the Federal House of Representatives are to be chosen "by the People," while attacks on state legislative apportionment schemes, such as that involved in the instant cases, are principally based on the Equal Protection Clause of the Fourteenth Amendment. Nevertheless, Wesberry clearly established that the fundamental principle of representative government in this country is one of equal *561 representation for equal numbers of people, without regard to race, sex, economic status, or place of residence within a State. Our problem, then, is to ascertain, in the instant cases, whether there are any constitutionally cognizable principles which would justify departures from the basic standard of equality among voters in the apportionment of seats in state legislatures.

III.
A predominant consideration in determining whether a State's legislative apportionment scheme constitutes an invidious discrimination violative of rights asserted under the Equal Protection Clause is that the rights allegedly impaired are individual and personal in nature. As stated by the Court in United States v. Bathgate, 246 U. S. 220, 227, "[t]he right to vote is personal . . . ."[39] While the result of a court decision in a state legislative apportionment controversy may be to require the restructuring of the geographical distribution of seats in a state legislature, the judicial focus must be concentrated upon ascertaining whether there has been any discrimination against certain of the State's citizens which constitutes an impermissible impairment of their constitutionally protected right to vote. Like Skinner v. Oklahoma, 316 U. S. 535, such a case "touches a sensitive and important area of human rights," and "involves one of the basic civil rights of man," presenting questions of alleged "invidious discriminations . . . against groups or types of individuals in violation of the constitutional guaranty of just and equal laws." 316 U. S., at 536, 541. Undoubtedly, the right of suffrage is a fundamental matter *562 in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized. Almost a century ago, in Yick Wo v. Hopkins, 118 U. S. 356, the Court referred to "the political franchise of voting" as "a fundamental political right, because preservative of all rights." 118 U. S., at 370.
Legislators represent people, not trees or acres. Legislators are elected by voters, not farms or cities or economic interests. As long as ours is a representative form of government, and our legislatures are those instruments of government elected directly by and directly representative of the people, the right to elect legislators in a free and unimpaired fashion is a bedrock of our political system. It could hardly be gainsaid that a constitutional claim had been asserted by an allegation that certain otherwise qualified voters had been entirely prohibited from voting for members of their state legislature. And, if a State should provide that the votes of citizens in one part of the State should be given two times, or five times, or 10 times the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote of those residing in the disfavored areas had not been effectively diluted. It would appear extraordinary to suggest that a State could be constitutionally permitted to enact a law providing that certain of the State's voters could vote two, five, or 10 times for their legislative representatives, while voters living elsewhere could vote only once. And it is inconceivable that a state law to the effect that, in counting votes for legislators, the votes of citizens in one part of the State would be multiplied by two, five, or 10, while the votes of persons in another area would be counted only at face value, could be constitutionally sustainable. Of course, the effect of *563 state legislative districting schemes which give the same number of representatives to unequal numbers of constituents is identical.[40] Overweighting and overvaluation of the votes of those living here has the certain effect of dilution and undervaluation of the votes of those living there. The resulting discrimination against those individual voters living in disfavored areas is easily demonstrable mathematically. Their right to vote is simply not the same right to vote as that of those living in a favored part of the State. Two, five, or 10 of them must vote before the effect of their voting is equivalent to that of their favored neighbor. Weighting the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable. One must be ever aware that the Constitution forbids "sophisticated as well as simple-minded modes of discrimination." Lane v. Wilson, 307 U. S. 268, 275; Gomillion v. Lightfoot, 364 U. S. 339, 342. As we stated in Wesberry v. Sanders, supra:
"We do not believe that the Framers of the Constitution intended to permit the same vote-diluting discrimination to be accomplished through the device of districts containing widely varied numbers of inhabitants. To say that a vote is worth *564 more in one district than in another would . . . run counter to our fundamental ideas of democratic government . . . ."[41]
State legislatures are, historically, the fountainhead of representative government in this country. A number of them have their roots in colonial times, and substantially antedate the creation of our Nation and our Federal Government. In fact, the first formal stirrings of American political independence are to be found, in large part, in the views and actions of several of the colonial legislative bodies. With the birth of our National Government, and the adoption and ratification of the Federal *565 Constitution, state legislatures retained a most important place in our Nation's governmental structure. But representative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies. Most citizens can achieve this participation only as qualified voters through the election of legislators to represent them. Full and effective participation by all citizens in state government requires, therefore, that each citizen have an equally effective voice in the election of members of his state legislature. Modern and viable state government needs, and the Constitution demands, no less.
Logically, in a society ostensibly grounded on representative government, it would seem reasonable that a majority of the people of a State could elect a majority of that State's legislators. To conclude differently, and to sanction minority control of state legislative bodies, would appear to deny majority rights in a way that far surpasses any possible denial of minority rights that might otherwise be thought to result. Since legislatures are responsible for enacting laws by which all citizens are to be governed, they should be bodies which are collectively responsive to the popular will. And the concept of equal protection has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged. With respect to the allocation of legislative representation, all voters, as citizens of a State, stand in the same relation regardless of where they live. Any suggested criteria for the differentiation of citizens are insufficient to justify any discrimination, as to the weight of their votes, unless relevant to the permissible purposes of legislative apportionment. Since the achieving of fair and effective representation for all citizens *566 is concededly the basic aim of legislative apportionment, we conclude that the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of state legislators. Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race, Brown v. Board of Education, 347 U. S. 483, or economic status, Griffin v. Illinois, 351 U. S. 12, Douglas v. California, 372 U. S. 353. Our constitutional system amply provides for the protection of minorities by means other than giving them majority control of state legislatures. And the democratic ideals of equality and majority rule, which have served this Nation so well in the past, are hardly of any less significance for the present and the future.
We are told that the matter of apportioning representation in a state legislature is a complex and many-faceted one. We are advised that States can rationally consider factors other than population in apportioning legislative representation. We are admonished not to restrict the power of the States to impose differing views as to political philosophy on their citizens. We are cautioned about the dangers of entering into political thickets and mathematical quagmires. Our answer is this: a denial of constitutionally protected rights demands judicial protection; our oath and our office require no less of us. As stated in Gomillion v. Lightfoot, supra:
"When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right."[42]
*567 To the extent that a citizen's right to vote is debased, he is that much less a citizen. The fact that an individual lives here or there is not a legitimate reason for overweighting or diluting the efficacy of his vote. The complexions of societies and civilizations change, often with amazing rapidity. A nation once primarily rural in character becomes predominantly urban.[43] Representation schemes once fair and equitable become archaic and outdated. But the basic principle of representative government remains, and must remain, unchangedโthe weight of a citizen's vote cannot be made to depend on where he lives. Population is, of necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies.[44] *568 A citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm. This is the clear and strong command of our Constitution's Equal Protection Clause. This is an essential part of the concept of a government of laws and not men. This is at the heart of Lincoln's vision of "government of the people, by the people, [and] for the people." The Equal Protection Clause demands no less than substantially equal state legislative representation for all citizens, of all places as well as of all races.

IV.
We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis. Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State. Since, under neither the existing apportionment provisions nor either of the proposed plans was either of the houses of the Alabama Legislature apportioned on a population basis, the District Court correctly held that all three of these schemes were constitutionally invalid. Furthermore, the existing apportionment, and also to a lesser extent the apportionment under the Crawford-Webb Act, presented little more than crazy quilts, completely lacking in rationality, and could be found invalid on that basis alone.[45] Although *569 the District Court presumably found the apportionment of the Alabama House of Representatives under the 67-Senator Amendment to be acceptable, we conclude that the deviations from a strict population basis are too egregious to permit us to find that that body, under this proposed plan, was apportioned sufficiently on a population basis so as to permit the arrangement to be constitutionally sustained. Although about 43% of the State's total population would be required to comprise districts which could elect a majority in that body, only 39 of the 106 House seats were actually to be distributed on a population basis, as each of Alabama's 67 counties was given at least one representative, and population-variance ratios of close to 5-to-1 would have existed. While mathematical nicety is not a constitutional requisite, one could hardly conclude that the Alabama House, under the proposed constitutional amendment, had been apportioned sufficiently on a population basis to be sustainable under the requirements of the Equal Protection Clause. And none of the other apportionments of seats in either of the bodies of the Alabama Legislature, under the three plans considered by the District Court, came nearly as close to approaching the required constitutional standard as did that of the House of Representatives under the 67-Senator Amendment.
Legislative apportionment in Alabama is signally illustrative and symptomatic of the seriousness of this problem in a number of the States. At the time this litigation was commenced, there had been no reapportionment *570 of seats in the Alabama Legislature for over 60 years.[46] Legislative inaction, coupled with the unavailability of any political or judicial remedy,[47] had resulted, with the passage of years, in the perpetuated scheme becoming little more than an irrational anachronism. Consistent failure by the Alabama Legislature to comply with state constitutional requirements as to the frequency of reapportionment and the bases of legislative representation resulted in a minority strangle hold on the State Legislature. Inequality of representation in one house added to the inequality in the other. With the crazy-quilt existing apportionment virtually conceded to be invalid, the Alabama Legislature offered two proposed plans for consideration by the District Court, neither of which was to be effective until 1966 and neither of which provided for the apportionment of even one of the two houses on a population basis. We find that the court below did not err in holding that neither of these proposed reapportionment schemes, considered as a whole, "meets the necessary constitutional requirements." And we conclude that the District Court acted properly in considering these two proposed plans, although neither was to become effective until the 1966 election and the proposed constitutional amendment was scheduled to be submitted to the State's voters in November 1962.[48] *571 Consideration by the court below of the two proposed plans was clearly necessary in determining whether the Alabama Legislature had acted effectively to correct the admittedly existing malapportionment, and in ascertaining what sort of judicial relief, if any, should be afforded.

V.
Since neither of the houses of the Alabama Legislature, under any of the three plans considered by the District Court, was apportioned on a population basis, we would be justified in proceeding no further. However, one of the proposed plans, that contained in the so-called 67-Senator Amendment, at least superficially resembles the scheme of legislative representation followed in the Federal Congress. Under this plan, each of Alabama's 67 counties is allotted one senator, and no counties are given more than one Senate seat. Arguably, this is analogous to the allocation of two Senate seats, in the Federal Congress, to each of the 50 States, regardless of population. Seats in the Alabama House, under the proposed constitutional amendment, are distributed by giving each of the 67 counties at least one, with the remaining 39 seats being allotted among the more populous counties on a population basis. This scheme, at least at first glance, appears to resemble that prescribed for the Federal House of Representatives, where the 435 seats are distributed among the States on a population basis, although each State, regardless of its population, is given at least one Congressman. Thus, although there are substantial differences in underlying rationale and result,[49] *572 the 67-Senator Amendment, as proposed by the Alabama Legislature, at least arguably presents for consideration a scheme analogous to that used for apportioning seats in Congress.
Much has been written since our decision in Baker v. Carr about the applicability of the so-called federal analogy to state legislative apportionment arrangements.[50] After considering the matter, the court below concluded that no conceivable analogy could be drawn between the federal scheme and the apportionment of seats in the Alabama Legislature under the proposed constitutional *573 amendment.[51] We agree with the District Court, and find the federal analogy inapposite and irrelevant to state legislative districting schemes. Attempted reliance on the federal analogy appears often to be little more than an after-the-fact rationalization offered in defense of maladjusted state apportionment arrangements. The original constitutions of 36 of our States provided that representation in both houses of the state legislatures would be based completely, or predominantly, on population.[52] And the Founding Fathers clearly had no intention of establishing a pattern or model for the apportionment of seats in state legislatures when the system of representation in the Federal Congress was adopted.[53] Demonstrative of this is the fact that the Northwest Ordinance, adopted in the same year, 1787, as the Federal Constitution, provided for the apportionment of seats in territorial legislatures solely on the basis of population.[54]
*574 The system of representation in the two Houses of the Federal Congress is one ingrained in our Constitution, as part of the law of the land. It is one conceived out of compromise and concession indispensable to the establishment of our federal republic.[55] Arising from unique historical circumstances, it is based on the consideration that in establishing our type of federalism a group of formerly independent States bound themselves together under one national government. Admittedly, the original 13 States surrendered some of their sovereignty in agreeing to join together "to form a more perfect Union." But at the heart of our constitutional system remains the concept of separate and distinct governmental entities which have delegated some, but not all, of their formerly held powers to the single national government. The fact that almost three-fourths of our present States were never in fact independently sovereign does not detract from our view that the so-called federal analogy is inapplicable as a sustaining precedent for state legislative apportionments. The developing history and growth of our republic cannot cloud the fact that, at the time of the inception of the system of representation in the Federal Congress, a compromise between the larger and smaller States on this matter averted a deadlock in the Constitutional Convention which had threatened to abort the birth of our Nation. In rejecting an asserted analogy to the federal electoral college in Gray v. Sanders, supra, we stated:
"We think the analogies to the electoral college, to districting and redistricting, and to other phases of the problems of representation in state or federal legislatures or conventions are inapposite. The inclusion of the electoral college in the Constitution, as the result of specific historical concerns, validated the collegiate principle despite its inherent numerical inequality, but implied nothing about the use of *575 an analogous system by a State in a statewide election. No such specific accommodation of the latter was ever undertaken, and therefore no validation of its numerical inequality ensued."[56]
Political subdivisions of Statesโcounties, cities, or whateverโnever were and never have been considered as sovereign entities. Rather, they have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions. As stated by the Court in Hunter v. City of Pittsburgh, 207 U. S. 161, 178, these governmental units are "created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them," and the "number, nature and duration of the powers conferred upon [them] . . . and the territory over which they shall be exercised rests in the absolute discretion of the State." The relationship of the States to the Federal Government could hardly be less analogous.
Thus, we conclude that the plan contained in the 67-Senator Amendment for apportioning seats in the Alabama Legislature cannot be sustained by recourse to the so-called federal analogy. Nor can any other inequitable state legislative apportionment scheme be justified on such an asserted basis. This does not necessarily mean that such a plan is irrational or involves something other than a "republican form of government." We conclude simply that such a plan is impermissible for the States under the Equal Protection Clause, since perforce resulting, in virtually every case, in submergence of the equal-population principle in at least one house of a state legislature.
Since we find the so-called federal analogy inapposite to a consideration of the constitutional validity of state *576 legislative apportionment schemes, we necessarily hold that the Equal Protection Clause requires both houses of a state legislature to be apportioned on a population basis. The right of a citizen to equal representation and to have his vote weighted equally with those of all other citizens in the election of members of one house of a bicameral state legislature would amount to little if States could effectively submerge the equal-population principle in the apportionment of seats in the other house. If such a scheme were permissible, an individual citizen's ability to exercise an effective voice in the only instrument of state government directly representative of the people might be almost as effectively thwarted as if neither house were apportioned on a population basis. Deadlock between the two bodies might result in compromise and concession on some issues. But in all too many cases the more probable result would be frustration of the majority will through minority veto in the house not apportioned on a population basis, stemming directly from the failure to accord adequate overall legislative representation to all of the State's citizens on a nondiscriminatory basis. In summary, we can perceive no constitutional difference, with respect to the geographical distribution of state legislative representation, between the two houses of a bicameral state legislature.
We do not believe that the concept of bicameralism is rendered anachronistic and meaningless when the predominant basis of representation in the two state legislative bodies is required to be the sameโpopulation. A prime reason for bicameralism, modernly considered, is to insure mature and deliberate consideration of, and to prevent precipitate action on, proposed legislative measures. Simply because the controlling criterion for apportioning representation is required to be the same in both houses does not mean that there will be no differences in the composition and complexion of the two bodies. Different *577 constituencies can be represented in the two houses. One body could be composed of single-member districts while the other could have at least some multimember districts. The length of terms of the legislators in the separate bodies could differ. The numerical size of the two bodies could be made to differ, even significantly, and the geographical size of districts from which legislators are elected could also be made to differ. And apportionment in one house could be arranged so as to balance off minor inequities in the representation of certain areas in the other house. In summary, these and other factors could be, and are presently in many States, utilized to engender differing complexions and collective attitudes in the two bodies of a state legislature, although both are apportioned substantially on a population basis.

VI.
By holding that as a federal constitutional requisite both houses of a state legislature must be apportioned on a population basis, we mean that the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable. We realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement.[57]
In Wesberry v. Sanders, supra, the Court stated that congressional representation must be based on population as nearly as is practicable. In implementing the basic constitutional principle of representative government as enunciated by the Court in Wesberryโequality of population *578 among districtsโsome distinctions may well be made between congressional and state legislative representation. Since, almost invariably, there is a significantly larger number of seats in state legislative bodies to be distributed within a State than congressional seats, it may be feasible to use political subdivision lines to a greater extent in establishing state legislative districts than in congressional districting while still affording adequate representation to all parts of the State. To do so would be constitutionally valid, so long as the resulting apportionment was one based substantially on population and the equal-population principle was not diluted in any significant way. Somewhat more flexibility may therefore be constitutionally permissible with respect to state legislative apportionment than in congressional districting. Lower courts can and assuredly will work out more concrete and specific standards for evaluating state legislative apportionment schemes in the context of actual litigation. For the present, we deem it expedient not to attempt to spell out any precise constitutional tests. What is marginally permissible in one State may be unsatisfactory in another, depending on the particular circumstances of the case. Developing a body of doctrine on a case-by-case basis appears to us to provide the most satisfactory means of arriving at detailed constitutional requirements in the area of state legislative apportionment. Cf. Slaughter-House Cases, 16 Wall. 36, 78-79. Thus, we proceed to state here only a few rather general considerations which appear to us to be relevant.
A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. Valid considerations may underlie such aims. Indiscriminate districting, without any regard for political subdivision or *579 natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering. Single-member districts may be the rule in one State, while another State might desire to achieve some flexibility by creating multimember[58] or floterial districts.[59] Whatever the means of accomplishment, the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State.
History indicates, however, that many States have deviated, to a greater or lesser degree, from the equal-population principle in the apportionment of seats in at least one house of their legislatures.[60] So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature. But neither history alone,[61] nor economic or other sorts of *580 group interests, are permissible factors in attempting to justify disparities from population-based representation. Citizens, not history or economic interests, cast votes. Considerations of area alone provide an insufficient justification for deviations from the equal-population principle. Again, people, not land or trees or pastures, vote. Modern developments and improvements in transportation and communications make rather hollow, in the mid-1960's, most claims that deviations from population-based representation can validly be based solely on geographical considerations. Arguments for allowing such deviations in order to insure effective representation for sparsely settled areas and to prevent legislative districts from becoming so large that the availability of access of citizens to their representatives is impaired are today, for the most part, unconvincing.
A consideration that appears to be of more substance in justifying some deviations from population-based representation in state legislatures is that of insuring some voice to political subdivisions, as political subdivisions. Several factors make more than insubstantial claims that a State can rationally consider according political subdivisions some independent representation in at least one body of the state legislature, as long as the basic standard of equality of population among districts is maintained. Local governmental entities are frequently charged with various responsibilities incident to the operation of state government. In many States much of the legislature's activity involves the enactment of so-called local *581 legislation, directed only to the concerns of particular political subdivisions. And a State may legitimately desire to construct districts along political subdivision lines to deter the possibilities of gerrymandering. However, permitting deviations from population-based representation does not mean that each local governmental unit or political subdivision can be given separate representation, regardless of population. Carried too far, a scheme of giving at least one seat in one house to each political subdivision (for example, to each county) could easily result, in many States, in a total subversion of the equal-population principle in that legislative body.[62] This would be especially true in a State where the number of counties is large and many of them are sparsely populated, and the number of seats in the legislative body being apportioned does not significantly exceed the number of counties.[63] Such a result, we conclude, would be constitutionally impermissible. And careful judicial scrutiny must of course be given, in evaluating state apportionment schemes, to the character as well as the degree of deviations from a strict population basis. But if, even as a result of a clearly rational state policy of according some legislative representation to political subdivisions, population is submerged as the controlling consideration in the apportionment of seats in the particular legislative body, then the right of all of the State's citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired.

*582 VII.
One of the arguments frequently offered as a basis for upholding a State's legislative apportionment arrangement, despite substantial disparities from a population basis in either or both houses, is grounded on congressional approval, incident to admitting States into the Union, of state apportionment plans containing deviations from the equal-population principle. Proponents of this argument contend that congressional approval of such schemes, despite their disparities from population-based representation, indicates that such arrangements are plainly sufficient as establishing a "republican form of government." As we stated in Baker v. Carr, some questions raised under the Guaranty Clause are nonjusticiable, where "political" in nature and where there is a clear absence of judicially manageable standards.[64] Nevertheless, it is not inconsistent with this view to hold that, despite congressional approval of state legislative apportionment plans at the time of admission into the Union, even though deviating from the equal-population principle here enunciated, the Equal Protection Clause can and does require more. And an apportionment scheme in which both houses are based on population can hardly be considered as failing to satisfy the Guaranty Clause requirement. Congress presumably does not assume, in admitting States into the Union, to pass on all constitutional questions relating to the character of state governmental organization. In any event, congressional approval, however well-considered, could hardly validate an unconstitutional state legislative apportionment. Congress simply lacks the constitutional power to insulate States from attack with respect to alleged deprivations of individual constitutional rights.

*583 VIII.
That the Equal Protection Clause requires that both houses of a state legislature be apportioned on a population basis does not mean that States cannot adopt some reasonable plan for periodic revision of their apportionment schemes. Decennial reapportionment appears to be a rational approach to readjustment of legislative representation in order to take into account population shifts and growth. Reallocation of legislative seats every 10 years coincides with the prescribed practice in 41 of the States,[65] often honored more in the breach than the observance, however. Illustratively, the Alabama Constitution requires decennial reapportionment, yet the last reapportionment of the Alabama Legislature, when this suit was brought, was in 1901. Limitations on the frequency of reapportionment are justified by the need for stability and continuity in the organization of the legislative system, although undoubtedly reapportioning no more frequently than every 10 years leads to some imbalance in the population of districts toward the end of the decennial period and also to the development of resistance to change on the part of some incumbent legislators. In substance, we do not regard the Equal Protection Clause as requiring daily, monthly, annual or biennial reapportionment, so long as a State has a reasonably conceived plan for periodic readjustment of legislative representation. While we do not intend to indicate that decennial reapportionment is a constitutional requisite, compliance with such an approach would clearly meet the minimal *584 requirements for maintaining a reasonably current scheme of legislative representation. And we do not mean to intimate that more frequent reapportionment would not be constitutionally permissible or practicably desirable. But if reapportionment were accomplished with less frequency, it would assuredly be constitutionally suspect.

IX.
Although general provisions of the Alabama Constitution provide that the apportionment of seats in both houses of the Alabama Legislature should be on a population basis, other more detailed provisions clearly make compliance with both sets of requirements impossible. With respect to the operation of the Equal Protection Clause, it makes no difference whether a State's apportionment scheme is embodied in its constitution or in statutory provisions. In those States where the alleged malapportionment has resulted from noncompliance with state constitutional provisions which, if complied with, would result in an apportionment valid under the Equal Protection Clause, the judicial task of providing effective relief would appear to be rather simple. We agree with the view of the District Court that state constitutional provisions should be deemed violative of the Federal Constitution only when validly asserted constitutional rights could not otherwise be protected and effectuated. Clearly, courts should attempt to accommodate the relief ordered to the apportionment provisions of state constitutions insofar as is possible. But it is also quite clear that a state legislative apportionment scheme is no less violative of the Federal Constitution when it is based on state constitutional provisions which have been consistently complied with than when resulting from a noncompliance with state constitutional requirements. When there is an unavoidable conflict between the Federal and a State Constitution, the Supremacy Clause of course controls.

*585 X.
We do not consider here the difficult question of the proper remedial devices which federal courts should utilize in state legislative apportionment cases.[66] Remedial techniques in this new and developing area of the law will probably often differ with the circumstances of the challenged apportionment and a variety of local conditions. It is enough to say now that, once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. However, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree. As stated by MR. JUSTICE DOUGLAS, concurring in Baker v. Carr, "any relief accorded can be fashioned in the light of well-known principles of equity."[67]
*586 We feel that the District Court in this case acted in a most proper and commendable manner. It initially acted wisely in declining to stay the impending primary election in Alabama, and properly refrained from acting further until the Alabama Legislature had been given an opportunity to remedy the admitted discrepancies in the State's legislative apportionment scheme, while initially stating some of its views to provide guidelines for legislative action. And it correctly recognized that legislative reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so. Additionally, the court below acted with proper judicial restraint, after the Alabama Legislature had failed to act effectively in remedying the constitutional deficiencies in the State's legislative apportionment scheme, in ordering its own temporary reapportionment plan into effect, at a time sufficiently early to permit the holding of elections pursuant to that plan without great difficulty, and in prescribing a plan admittedly provisional in purpose so as not to usurp the primary responsibility for reapportionment which rests with the legislature.
We find, therefore, that the action taken by the District Court in this case, in ordering into effect a reapportionment of both houses of the Alabama Legislature for purposes of the 1962 primary and general elections, by using the best parts of the two proposed plans which it had found, as a whole, to be invalid,[68] was an appropriate and *587 well-considered exercise of judicial power. Admittedly, the lower court's ordered plan was intended only as a temporary and provisional measure and the District Court correctly indicated that the plan was invalid as a permanent apportionment. In retaining jurisdiction while deferring a hearing on the issuance of a final injunction in order to give the provisionally reapportioned legislature an opportunity to act effectively, the court below proceeded in a proper fashion. Since the District Court evinced its realization that its ordered reapportionment could not be sustained as the basis for conducting the 1966 election of Alabama legislators, and avowedly intends to take some further action should the reapportioned Alabama Legislature fail to enact a constitutionally valid, permanent apportionment scheme in the interim, we affirm the judgment below and remand the cases for further proceedings consistent with the views stated in this opinion.
It is so ordered.
MR. JUSTICE CLARK, concurring in the affirmance.
The Court goes much beyond the necessities of this case in laying down a new "equal population" principle for state legislative apportionment. This principle seems to be an offshoot of Gray v. Sanders, 372 U. S. 368, 381 (1963), i. e., "one person, one vote," modified by the "nearly as is practicable" admonition of Wesberry v. Sanders, 376 U. S. 1, 8 (1964).[*] Whether "nearly as is *588 practicable" means "one person, one vote" qualified by "approximately equal" or "some deviations" or by the impossibility of "mathematical nicety" is not clear from the majority's use of these vague and meaningless phrases. But whatever the standard, the Court applies it to each house of the State Legislature.
It seems to me that all that the Court need say in this case is that each plan considered by the trial court is "a crazy quilt," clearly revealing invidious discrimination in each house of the Legislature and therefore violative of the Equal Protection Clause. See my concurring opinion in Baker v. Carr, 369 U. S. 186, 253-258 (1962).
I, therefore, do not reach the question of the so-called "federal analogy." But in my view, if one house of the State Legislature meets the population standard, representation in the other house might include some departure from it so as to take into account, on a rational basis, other factors in order to afford some representation to the various elements of the State. See my dissenting opinion in Lucas v. Forty-Fourth General Assembly of Colorado, post, p. 741, decided this date.
MR. JUSTICE STEWART.
All of the parties have agreed with the District Court's finding that legislative inaction for some 60 years in the face of growth and shifts in population has converted Alabama's legislative apportionment plan enacted in 1901 into one completely lacking in rationality. Accordingly, for the reasons stated in my dissenting opinion in Lucas v. Forty-Fourth General Assembly of Colorado, post, p. 744, I would affirm the judgment of the District Court holding that this apportionment violated the Equal Protection Clause.
I also agree with the Court that it was proper for the District Court, in framing a remedy, to adhere as closely *589 as practicable to the apportionments approved by the representatives of the people of Alabama, and to afford the State of Alabama full opportunity, consistent with the requirements of the Federal Constitution, to devise its own system of legislative apportionment.
MR. JUSTICE HARLAN, dissenting.[*]
In these cases the Court holds that seats in the legislatures of six States[1] are apportioned in ways that violate the Federal Constitution. Under the Court's ruling it is bound to follow that the legislatures in all but a few of the other 44 States will meet the same fate.[2] These decisions, with Wesberry v. Sanders, 376 U. S. 1, involving congressional districting by the States, and Gray v. Sanders, 372 U. S. 368, relating to elections for statewide office, have the effect of placing basic aspects of state political systems under the pervasive overlordship of the federal judiciary. Once again,[3] I must register my protest.

*590 PRELIMINARY STATEMENT.
Today's holding is that the Equal Protection Clause of the Fourteenth Amendment requires every State to structure its legislature so that all the members of each house represent substantially the same number of people; other factors may be given play only to the extent that they do not significantly encroach on this basic "population" principle. Whatever may be thought of this holding as a piece of political ideologyโand even on that score the political history and practices of this country from its earliest beginnings leave wide room for debate (see the dissenting opinion of Frankfurter, J., in Baker v. Carr, 369 U. S. 186, 266, 301-323)โI think it demonstrable that the Fourteenth Amendment does not impose this political tenet on the States or authorize this Court to do so.
The Court's constitutional discussion, found in its opinion in the Alabama cases (Nos. 23, 27, 41, ante, p. 533) and more particularly at pages 561-568 thereof, is remarkable (as, indeed, is that found in the separate opinions of my Brothers STEWART and CLARK, ante, pp. 588, 587) for its failure to address itself at all to the Fourteenth Amendment as a whole or to the legislative history of the Amendment pertinent to the matter at hand. Stripped of aphorisms, the Court's argument boils down to the assertion that appellees' right to vote has been invidiously "debased" or "diluted" by systems of apportionment which entitle them to vote for fewer legislators than other voters, an assertion which is tied to the Equal Protection Clause only by the constitutionally frail tautology that "equal" means "equal."
Had the Court paused to probe more deeply into the matter, it would have found that the Equal Protection Clause was never intended to inhibit the States in choosing *591 any democratic method they pleased for the apportionment of their legislatures. This is shown by the language of the Fourteenth Amendment taken as a whole, by the understanding of those who proposed and ratified it, and by the political practices of the States at the time the Amendment was adopted. It is confirmed by numerous state and congressional actions since the adoption of the Fourteenth Amendment, and by the common understanding of the Amendment as evidenced by subsequent constitutional amendments and decisions of this Court before Baker v. Carr, supra, made an abrupt break with the past in 1962.
The failure of the Court to consider any of these matters cannot be excused or explained by any concept of "developing" constitutionalism. It is meaningless to speak of constitutional "development" when both the language and history of the controlling provisions of the Constitution are wholly ignored. Since it can, I think, be shown beyond doubt that state legislative apportionments, as such, are wholly free of constitutional limitations, save such as may be imposed by the Republican Form of Government Clause (Const., Art. IV, ง 4),[4] the Court's action now bringing them within the purview of the Fourteenth Amendment amounts to nothing less than an exercise of the amending power by this Court.
So far as the Federal Constitution is concerned, the complaints in these cases should all have been dismissed below for failure to state a cause of action, because what *592 has been alleged or proved shows no violation of any constitutional right.
Before proceeding to my argument it should be observed that nothing done in Baker v. Carr, supra, or in the two cases that followed in its wake, Gray v. Sanders and Wesberry v. Sanders, supra, from which the Court quotes at some length, forecloses the conclusion which I reach.
Baker decided only that claims such as those made here are within the competence of the federal courts to adjudicate. Although the Court stated as its conclusion that the allegations of a denial of equal protection presented "a justiciable constitutional cause of action," 369 U. S., at 237, it is evident from the Court's opinion that it was concerned all but exclusively with justiciability and gave no serious attention to the question whether the Equal Protection Clause touches state legislative apportionments.[5] Neither the opinion of the Court nor any of the concurring opinions considered the relevant text of the Fourteenth Amendment or any of the historical materials bearing on that question. None of the materials was briefed or otherwise brought to the Court's attention.[6]
*593 In the Gray case the Court expressly laid aside the applicability to state legislative apportionments of the "one person, one vote" theory there found to require the striking down of the Georgia county unit system. See 372 U. S., at 376, and the concurring opinion of STEWART, J., joined by CLARK, J., id., at 381-382.
In Wesberry, involving congressional districting, the decision rested on Art. I, ง 2, of the Constitution. The Court expressly did not reach the arguments put forward concerning the Equal Protection Clause. See 376 U. S., at 8, note 10.
Thus it seems abundantly clear that the Court is entirely free to deal with the cases presently before it in light of materials now called to its attention for the first time. To these I now turn.

I.

A. The Language of the Fourteenth Amendment.

The Court relies exclusively on that portion of ง 1 of the Fourteenth Amendment which provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws," and disregards entirely the significance of ง 2, which reads:
"Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or *594 other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State." (Emphasis added.)
The Amendment is a single text. It was introduced and discussed as such in the Reconstruction Committee,[7] which reported it to the Congress. It was discussed as a unit in Congress and proposed as a unit to the States,[8] which ratified it as a unit. A proposal to split up the Amendment and submit each section to the States as a separate amendment was rejected by the Senate.[9] Whatever one might take to be the application to these cases of the Equal Protection Clause if it stood alone, I am unable to understand the Court's utter disregard of the second section which expressly recognizes the States' power to deny "or in any way" abridge the right of their inhabitants to vote for "the members of the [State] Legislature," and its express provision of a remedy for such denial or abridgment. The comprehensive scope of the second section and its particular reference to the state legislatures preclude the suggestion that the first section was intended to have the result reached by the Court today. If indeed the words of the Fourteenth Amendment speak for themselves, as the majority's disregard of history seems to imply, they speak as clearly as may be against the construction which the majority puts on them. But we are not limited to the language of the Amendment itself.

*595 B. Proposal and Ratification of the Amendment.

The history of the adoption of the Fourteenth Amendment provides conclusive evidence that neither those who proposed nor those who ratified the Amendment believed that the Equal Protection Clause limited the power of the States to apportion their legislatures as they saw fit. Moreover, the history demonstrates that the intention to leave this power undisturbed was deliberate and was widely believed to be essential to the adoption of the Amendment.
(i) Proposal of the amendment in Congress.โA resolution proposing what became the Fourteenth Amendment was reported to both houses of Congress by the Reconstruction Committee of Fifteen on April 30, 1866,[10] The first two sections of the proposed amendment read:
"SEC. 1. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
"SEC. 2. Representatives shall be apportioned among the several States which may be included within this Union, according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But whenever, in any State, the elective franchise shall be denied to any portion of its male citizens not less than twenty-one years of age, or in any way abridged except for participation in rebellion or other crime, the basis of representation in such State shall be reduced in the proportion which the number of such male citizens *596 shall bear to the whole number of male citizens not less than twenty-one years of age."[11]
In the House, Thaddeus Stevens introduced debate on the resolution on May 8. In his opening remarks, Stevens explained why he supported the resolution although it fell "far short" of his wishes:
"I believe it is all that can be obtained in the present state of public opinion. Not only Congress but the several States are to be consulted. Upon a careful survey of the whole ground, we did not believe that nineteen of the loyal States could be induced to ratify any proposition more stringent than this."[12]
In explanation of this belief, he asked the House to remember "that three months since, and more, the committee reported and the House adopted a proposed amendment fixing the basis of representation in such way as would surely have secured the enfranchisement of every citizen at no distant period," but that proposal had been rejected by the Senate.[13]
He then explained the impact of the first section of the proposed Amendment, particularly the Equal Protection Clause.
"This amendment . . . allows Congress to correct the unjust legislation of the States, so far that the *597 law which operates upon one man shall operate equally upon all. Whatever law punishes a white man for a crime shall punish the black man precisely in the same way and to the same degree. Whatever law protects the white man shall afford `equal' protection to the black man. Whatever means of redress is afforded to one shall be afforded to all. Whatever law allows the white man to testify in court shall allow the man of color to do the same. These are great advantages over their present codes. Now different degrees of punishment are inflicted, not on account of the magnitude of the crime, but according to the color of the skin. Now color disqualifies a man from testifying in courts, or being tried in the same way as white men. I need not enumerate these partial and oppressive laws. Unless the Constitution should restrain them those States will all, I fear, keep up this discrimination, and crush to death the hated freedmen."[14]
He turned next to the second section, which he said he considered "the most important in the article."[15] Its effect, he said, was to fix "the basis of representation in Congress."[16] In unmistakable terms, he recognized the power of a State to withhold the right to vote:
"If any State shall exclude any of her adult male citizens from the elective franchise, or abridge that right, she shall forfeit her right to representation in the same proportion. The effect of this provision will be either to compel the States to grant universal suffrage or so to shear them of their power as to keep them forever in a hopeless minority in the national Government, both legislative and executive."[17] *598 Closing his discussion of the second section, he noted his dislike for the fact that it allowed "the States to discriminate [with respect to the right to vote] among the same class, and receive proportionate credit in representation."[18]
Toward the end of the debate three days later, Mr. Bingham, the author of the first section in the Reconstruction Committee and its leading proponent,[19] concluded his discussion of it with the following:
"Allow me, Mr. Speaker, in passing, to say that this amendment takes from no State any right that ever pertained to it. No State ever had the right, under the forms of law or otherwise, to deny to any freeman the equal protection of the laws or to abridge the privileges or immunities of any citizen of the Republic, although many of them have assumed and exercised the power, and that without remedy. The amendment does not give, as the second section shows, the power to Congress of regulating suffrage in the several States."[20] (Emphasis added.)
He immediately continued:
"The second section excludes the conclusion that by the first section suffrage is subjected to congressional law; save, indeed, with this exception, that as the right in the people of each State to a republican government and to choose their Representatives in Congress is of the guarantees of the Constitution, by this amendment a remedy might be given directly for a case supposed by Madison, where treason might change a State government from a republican to a *599 despotic government, and thereby deny suffrage to the people."[21] (Emphasis added.)
He stated at another point in his remarks:
"To be sure we all agree, and the great body of the people of this country agree, and the committee thus far in reporting measures of reconstruction agree, that the exercise of the elective franchise, though it be one of the privileges of a citizen of the Republic, is exclusively under the control of the States."[22] (Emphasis added.)
In the three days of debate which separate the opening and closing remarks, both made by members of the Reconstruction Committee, every speaker on the resolution, with a single doubtful exception,[23] assumed without question that, as Mr. Bingham said, supra, "the second section excludes the conclusion that by the first section suffrage is subjected to congressional law." The assumption was neither inadvertent nor silent. Much of the debate concerned the change in the basis of representation effected by the second section, and the speakers stated repeatedly, in express terms or by unmistakable implication, that the States retained the power to regulate suffrage within their borders. Attached as Appendix A hereto are some of those statements. The resolution was adopted by the House without change on May 10.[24]
*600 Debate in the Senate began on May 23, and followed the same pattern. Speaking for the Senate Chairman of the Reconstruction Committee, who was ill, Senator Howard, also a member of the Committee, explained the meaning of the Equal Protection Clause as follows:
"The last two clauses of the first section of the amendment disable a State from depriving not merely a citizen of the United States, but any person, whoever he may be, of life, liberty, or property without due process of law, or from denying to him the equal protection of the laws of the State. This abolishes all class legislation in the States and does away with the injustice of subjecting one caste of persons to a code not applicable to another. It prohibits the hanging of a black man for a crime for which the white man is not to be hanged. It protects the black man in his fundamental rights as a citizen with the same shield which it throws over the white man. Is it not time, Mr. President, that we extend to the black man, I had almost called it the poor privilege of the equal protection of the law? . . .
"But, sir, the first section of the proposed amendment does not give to either of these classes the right of voting. The right of suffrage is not, in law, one of the privileges or immunities thus secured by the Constitution. It is merely the creature of law. It has always been regarded in this country as the result of positive local law, not regarded as one of those fundamental rights lying at the basis of all society and without which a people cannot exist except as slaves, subject to a depotism [sic]."[25] (Emphasis added.)
Discussing the second section, he expressed his regret that it did "not recognize the authority of the United States over the question of suffrage in the several States *601 at all . . . ."[26] He justified the limited purpose of the Amendment in this regard as follows:
"But, sir, it is not the question here what will we do; it is not the question what you, or I, or half a dozen other members of the Senate may prefer in respect to colored suffrage; it is not entirely the question what measure we can pass through the two Houses; but the question really is, what will the Legislatures of the various States to whom these amendments are to be submitted do in the premises; what is it likely will meet the general approbation of the people who are to elect the Legislatures, three fourths of whom must ratify our propositions before they have the force of constitutional provisions?
.....
"The committee were of opinion that the States are not yet prepared to sanction so fundamental a change as would be the concession of the right of suffrage to the colored race. We may as well state it plainly and fairly, so that there shall be no misunderstanding on the subject. It was our opinion that three fourths of the States of this Union could not be induced to vote to grant the right of suffrage, even in any degree or under any restriction, to the colored race. . . .

"The second section leaves the right to regulate the elective franchise still with the States, and does not meddle with that right."[27] (Emphasis added.)
There was not in the Senate, as there had been in the House, a closing speech in explanation of the Amendment. But because the Senate considered, and finally adopted, several changes in the first and second sections, even more attention was given to the problem of voting rights there than had been given in the House. In the *602 Senate, it was fully understood by everyone that neither the first nor the second section interfered with the right of the States to regulate the elective franchise. Attached as Appendix B hereto are representative statements from the debates to that effect. After having changed the proposed amendment to the form in which it was adopted, the Senate passed the resolution on June 8, 1866.[28] As changed, it passed in the House on June 13.[29]
(ii) Ratification by the "loyal" States.โReports of the debates in the state legislatures on the ratification of the Fourteenth Amendment are not generally available.[30] There is, however, compelling indirect evidence. Of the 23 loyal States which ratified the Amendment before 1870, five had constitutional provisions for apportionment of at least one house of their respective legislatures which wholly disregarded the spread of population.[31] *603 Ten more had constitutional provisions which gave primary emphasis to population, but which applied also other principles, such as partial ratios and recognition of political subdivisions, which were intended to favor sparsely settled areas.[32] Can it be seriously contended that the legislatures of these States, almost two-thirds of those concerned, would have ratified an amendment which might render their own States' constitutions unconstitutional?
Nor were these state constitutional provisions merely theoretical. In New Jersey, for example, Cape May County, with a population of 8,349, and Ocean County, with a population of 13,628, each elected one State Senator, as did Essex and Hudson Counties, with populations of 143,839 and 129,067, respectively.[33] In the House, each county was entitled to one representative, which left 39 seats to be apportioned according to population.[34] Since there were 12 counties besides the two already mentioned which had populations over 30,000,[35] it is evident that there were serious disproportions in the House also. In *604 New York, each of the 60 counties except Hamilton County was entitled to one of the 128 seats in the Assembly.[36] This left 69 seats to be distributed among counties the populations of which ranged from 15,420 to 942,292.[37] With seven more counties having populations over 100,000 and 13 others having populations over 50,000,[38] the disproportion in the Assembly was necessarily large. In Vermont, after each county had been allocated one Senator, there were 16 seats remaining to be distributed among the larger counties.[39] The smallest county had a population of 4,082; the largest had a population of 40,651 and there were 10 other counties with populations over 20,000.[40]
(iii) Ratification by the "reconstructed" States.โ Each of the 10 "reconstructed" States was required to ratify the Fourteenth Amendment before it was readmitted to the Union.[41] The Constitution of each was scrutinized in Congress.[42] Debates over readmission *605 were extensive.[43] In at least one instance, the problem of state legislative apportionment was expressly called to the attention of Congress. Objecting to the inclusion of Florida in the Act of June 25, 1868, Mr. Farnsworth stated on the floor of the House:
"I might refer to the apportionment of representatives. By this constitution representatives in the Legislature of Florida are apportioned in such a manner as to give to the sparsely-populated portions of the State the control of the Legislature. The sparsely-populated parts of the State are those where there are very few negroes, the parts inhabited by the white rebels, the men who, coming in from Georgia, Alabama, and other States, control the fortunes of their several counties. By this constitution every county in that State is entitled to a representative. There are in that State counties that have not thirty registered voters; yet, under this constitution, every one of those counties is entitled *606 to a representative in the Legislature; while the populous counties are entitled to only one representative each, with an additional representative for every thousand inhabitants."[44]
The response of Mr. Butler is particularly illuminating:
"All these arguments, all these statements, all the provisions of this constitution have been submitted to the Judiciary Committee of the Senate, and they have found the constitution republican and proper. This constitution has been submitted to the Senate, and they have found it republican and proper. It has been submitted to your own Committee on Reconstruction, and they have found it republican and proper, and have reported it to this House."[45]
The Constitutions of six of the 10 States contained provisions departing substantially from the method of apportionment now held to be required by the Amendment.[46] And, as in the North, the departures were as real in fact as in theory. In North Carolina, 90 of the 120 representatives were apportioned among the counties without regard to population, leaving 30 seats to be distributed by numbers.[47] Since there were seven counties with populations under 5,000 and 26 counties with populations over 15,000, the disproportions must have been widespread and substantial.[48] In South Carolina, Charleston, with a population of 88,863, elected two Senators; each of the other counties, with populations ranging from 10,269 to *607 42,486, elected one Senator.[49] In Florida, each of the 39 counties was entitled to elect one Representative; no county was entitled to more than four.[50] These principles applied to Dade County, with a population of 85, and to Alachua County and Leon County, with populations of 17,328 and 15,236, respectively.[51]
It is incredible that Congress would have exacted ratification of the Fourteenth Amendment as the price of readmission, would have studied the State Constitutions for compliance with the Amendment, and would then have disregarded violations of it.
The facts recited above show beyond any possible doubt:
(1) that Congress, with full awareness of and attention to the possibility that the States would not afford full equality in voting rights to all their citizens, nevertheless deliberately chose not to interfere with the States' plenary power in this regard when it proposed the Fourteenth Amendment;
(2) that Congress did not include in the Fourteenth Amendment restrictions on the States' power to control voting rights because it believed that if such restrictions were included, the Amendment would not be adopted; and
(3) that at least a substantial majority, if not all, of the States which ratified the Fourteenth Amendment did not consider that in so doing, they were accepting limitations on their freedom, never before questioned, to regulate voting rights as they chose.
Even if one were to accept the majority's belief that it is proper entirely to disregard the unmistakable implications *608 of the second section of the Amendment in construing the first section, one is confounded by its disregard of all this history. There is here none of the difficulty which may attend the application of basic principles to situations not contemplated or understood when the principles were framed. The problems which concern the Court now were problems when the Amendment was adopted. By the deliberate choice of those responsible for the Amendment, it left those problems untouched.

C. After 1868.

The years following 1868, far from indicating a developing awareness of the applicability of the Fourteenth Amendment to problems of apportionment, demonstrate precisely the reverse: that the States retained and exercised the power independently to apportion their legislatures. In its Constitutions of 1875 and 1901, Alabama carried forward earlier provisions guaranteeing each county at least one representative and fixing an upper limit to the number of seats in the House.[52] Florida's Constitution of 1885 continued the guarantee of one representative for each county and reduced the maximum number of representatives per county from four to three.[53] Georgia, in 1877, continued to favor the smaller counties.[54] Louisiana, in 1879, guaranteed each parish at least one representative in the House.[55] In 1890, Mississippi guaranteed each county one representative, established a maximum number of representatives, and provided that specified groups of counties should each have approximately one-third of the seats in the House, whatever *609 the spread of population.[56] Missouri's Constitution of 1875 gave each county one representative and otherwise favored less populous areas.[57] Montana's original Constitution of 1889 apportioned the State Senate by counties.[58] In 1877, New Hampshire amended its Constitution's provisions for apportionment, but continued to favor sparsely settled areas in the House and to apportion seats in the Senate according to direct taxes paid;[59] the same was true of New Hampshire's Constitution of 1902.[60]
In 1894, New York adopted a Constitution the peculiar apportionment provisions of which were obviously intended to prevent representation according to population: no county was allowed to have more than one-third of all the Senators, no two counties which were adjoining or "separated only by public waters" could have more than one-half of all the Senators, and whenever any county became entitled to more than three Senators, the total number of Senators was increased, thus preserving to the small counties their original number of seats.[61] In addition, each county except Hamilton was guaranteed a seat in the Assembly.[62] The North Carolina Constitution of 1876 gave each county at least one representative and fixed a maximum number of representatives for the whole House.[63] Oklahoma's Constitution at the time of its admission to the Union (1907) favored small counties by the use of partial ratios and a maximum number of seats in the House; in addition, no county was permitted to "take part" in the election of more than seven *610 representatives.[64] Pennsylvania, in 1873, continued to guarantee each county one representative in the House.[65] The same was true of South Carolina's Constitution of 1895, which provided also that each county should elect one and only one Senator.[66] Utah's original Constitution of 1895 assured each county of one representative in the House.[67] Wyoming, when it entered the Union in 1889, guaranteed each county at least one Senator and one representative.[68]

D. Today.

Since the Court now invalidates the legislative apportionments in six States, and has so far upheld the apportionment in none, it is scarcely necessary to comment on the situation in the States today, which is, of course, as fully contrary to the Court's decision as is the record of every prior period in this Nation's history. As of 1961, the Constitutions of all but 11 States, roughly 20% of the total, recognized bases of apportionment other than geographic spread of population, and to some extent favored sparsely populated areas by a variety of devices, ranging from straight area representation or guaranteed minimum area representation to complicated schemes of the kind exemplified by the provisions of New York's Constitution of 1894, still in effect until struck down by the Court today in No. 20, post, p. 633.[69] Since *611 Tennessee, which was the subject of Baker v. Carr, and Virginia, scrutinized and disapproved today in No. 69, post, p. 678, are among the 11 States whose own Constitutions are sound from the standpoint of the Federal Constitution as construed today, it is evident that the actual practice of the States is even more uniformly than their theory opposed to the Court's view of what is constitutionally permissible.

E. Other Factors.

In this summary of what the majority ignores, note should be taken of the Fifteenth and Nineteenth Amendments. The former prohibited the States from denying or abridging the right to vote "on account of race, color, or previous condition of servitude." The latter, certified as part of the Constitution in 1920, added sex to the prohibited classifications. In Minor v. Happersett, 21 Wall. 162, this Court considered the claim that the right of women to vote was protected by the Privileges and Immunities Clause of the Fourteenth Amendment. The Court's discussion there of the significance of the Fifteenth Amendment is fully applicable here with respect to the Nineteenth Amendment as well.
"And still again, after the adoption of the fourteenth amendment, it was deemed necessary to adopt a fifteenth, as follows: `The right of citizens of the United States to vote shall not be denied or abridged by the United States, or by any State, on account of race, color, or previous condition of servitude.' The fourteenth amendment had already provided that no State should make or enforce any law which should abridge the privileges or immunities of citizens of the United States. If suffrage was one of these privileges or immunities, why amend the Constitution to prevent its being denied on account of race, &c.? Nothing is more evident than that the greater must *612 include the less, and if all were already protected why go through with the form of amending the Constitution to protect a part?" Id., at 175.
In the present case, we can go still further. If constitutional amendment was the only means by which all men and, later, women, could be guaranteed the right to vote at all, even for federal officers, how can it be that the far less obvious right to a particular kind of apportionment of state legislaturesโa right to which is opposed a far more plausible conflicting interest of the State than the interest which opposes the general right to voteโcan be conferred by judicial construction of the Fourteenth Amendment?[70] Yet, unless one takes the highly implausible view that the Fourteenth Amendment controls methods of apportionment but leaves the right to vote itself unprotected, the conclusion is inescapable that the Court has, for purposes of these cases, relegated the Fifteenth and Nineteenth Amendments to the same limbo of constitutional anachronisms to which the second section of the Fourteenth Amendment has been assigned.
Mention should be made finally of the decisions of this Court which are disregarded or, more accurately, silently overruled today. Minor v. Happersett, supra, in which the Court held that the Fourteenth Amendment did not *613 confer the right to vote on anyone, has already been noted. Other cases are more directly in point. In Colegrove v. Barrett, 330 U. S. 804, this Court dismissed "for want of a substantial federal question" an appeal from the dismissal of a complaint alleging that the Illinois legislative apportionment resulted in "gross inequality in voting power" and "gross and arbitrary and atrocious discrimination in voting" which denied the plaintiffs equal protection of the laws.[71] In Remmey v. Smith, 102 F. Supp. 708 (D. C. E. D. Pa.), a three-judge District Court dismissed a complaint alleging that the apportionment of the Pennsylvania Legislature deprived the plaintiffs of "constitutional rights guaranteed to them by the Fourteenth Amendment." Id., at 709. The District Court stated that it was aware that the plaintiffs' allegations were "notoriously true" and that "the practical disenfranchisement of qualified electors in certain of the election districts in Philadelphia County is a matter of common knowledge." Id., at 710. This Court dismissed the appeal " for the want of a substantial federal question." 342 U. S. 916.
In Kidd v. McCanless, 200 Tenn. 273, 292 S. W. 2d 40, the supreme Court of Tennessee dismissed an action for a declaratory judgment that the Tennessee Apportionment Act of 1901 was unconstitutional. The complaint alleged that "a minority of approximately 37% of the voting population of the State now elects and controls 20 of the 33 members of the Senate; that a minority of 40% of the voting population of the State now controls 63 of the 99 members of the House of Representatives." Id., at 276, 292 S. W. 2d, at 42. Without dissent, this Court granted the motion to dismiss the appeal. 352 U. S. 920. In Radford v. Gary, 145 F. Supp. 541 (D. C. W. D. Okla.), a three-judge District Court was *614 convened to consider "the complaint of the plaintiff to the effect that the existing apportionment statutes of the State of Oklahoma violate the plain mandate of the Oklahoma Constitution and operate to deprive him of the equal protection of the laws guaranteed by the Fourteenth Amendment to the Constitution of the United States." Id., at 542. The plaintiff alleged that he was a resident and voter in the most populous county of the State, which had about 15% of the total population of the State but only about 2% of the seats in the State Senate and less than 4% of the seats in the House. The complaint recited the unwillingness or inability of the branches of the state government to provide relief and alleged that there was no state remedy available. The District Court granted a motion to dismiss. This Court affirmed without dissent. 352 U. S. 991.
Each of these recent cases is distinguished on some ground or other in Baker v. Carr. See 369 U. S., at 235-236. Their summary dispositions prevent consideration whether these after-the-fact distinctions are real or imaginary. The fact remains, however, that between 1947 and 1957, four cases raising issues precisely the same as those decided today were presented to the Court. Three were dismissed because the issues presented were thought insubstantial and in the fourth the lower court's dismissal was affirmed.[72]
I have tried to make the catalogue complete, yet to keep it within the manageable limits of a judicial opinion. In my judgment, today's decisions are refuted by *615 the language of the Amendment which they construe and by the inference fairly to be drawn from subsequently enacted Amendments. They are unequivocally refuted by history and by consistent theory and practice from the time of the adoption of the Fourteenth Amendment until today.

II.
The Court's elaboration of its new "constitutional" doctrine indicates how farโand how unwiselyโit has strayed from the appropriate bounds of its authority. The consequence of today's decision is that in all but the handful of States which may already satisfy the new requirements the local District Court or, it may be, the state courts, are given blanket authority and the constitutional duty to supervise apportionment of the State Legislatures. It is difficult to imagine a more intolerable and inappropriate interference by the judiciary with the independent legislatures of the States.
In the Alabama cases (Nos. 23, 27, 41), the District Court held invalid not only existing provisions of the State Constitutionโwhich this Court lightly dismisses with a wave of the Supremacy Clause and the remark *616 that "it makes no difference whether a State's apportionment scheme is embodied in its constitution or in statutory provisions," ante, p. 584โbut also a proposed amendment to the Alabama Constitution which had never been submitted to the voters of Alabama for ratification, and "standby" legislation which was not to become effective unless the amendment was rejected (or declared unconstitutional) and in no event before 1966. Sims v. Frink, 208 F. Supp. 431. See ante, pp. 543-551. Both of these measures had been adopted only nine days before,[73] at an Extraordinary Session of the Alabama Legislature, convened pursuant to what was very nearly a directive of the District Court, see Sims v. Frink, 205 F. Supp. 245, 248. The District Court formulated its own plan for the apportionment of the Alabama Legislature, by picking and choosing among the provisions of the legislative measures. 208 F. Supp., at 441-442. See ante, p. 552. Beyond that, the court warned the legislature that there would be still further judicial reapportionment unless the legislature, like it or not, undertook the task for itself. 208 F. Supp., at 442. This Court now states that the District Court acted in "a most proper and commendable manner," ante, p. 586, and approves the District Court's avowed intention of taking "some further action" unless the State Legislature acts by 1966, ante, p. 587.
In the Maryland case (No. 29, post, p. 656), the State Legislature was called into Special Session and enacted a temporary reapportionment of the House of Delegates, under pressure from the state courts.[74] Thereafter, the *617 Maryland Court of Appeals held that the Maryland Senate was constitutionally apportioned. Maryland Committee for Fair Representation v. Tawes, 229 Md. 406, 184 A. 2d 715. This Court now holds that neither branch of the State Legislature meets constitutional requirements. Post, p. 674. The Court presumes that since "the Maryland constitutional provisions relating to legislative apportionment [are] hereby held unconstitutional, the Maryland Legislature . . . has the inherent power to enact at least temporary reapportionment legislation pending adoption of state constitutional provisions" which satisfy the Federal Constitution, id., at 675. On this premise, the Court concludes that the Maryland courts need not "feel obliged to take further affirmative action" now, but that "under no circumstances should the 1966 election of members of the Maryland Legislature be permitted to be conducted pursuant to the existing or any other unconstitutional plan." Id., at 676.
In the Virginia case (No. 69, post, p. 678), the State Legislature in 1962 complied with the state constitutional requirement of regular reapportionment.[75] Two days later, a complaint was filed in the District Court.[76] Eight months later, the legislative reapportionment was *618 declared unconstitutional. Mann v. Davis, 213 F. Supp. 577. The District Court gave the State Legislature two months within which to reapportion itself in special session, under penalty of being reapportioned by the court.[77] Only a stay granted by a member of this Court slowed the process;[78] it is plain that no stay will be forthcoming in the future. The Virginia Legislature is to be given "an adequate opportunity to enact a valid plan"; but if it fails "to act promptly in remedying the constitutional defects in the State's legislative apportionment plan," the District Court is to "take further action." Post, p. 693.
In Delaware (No. 307, post, p. 695), the District Court entered an order on July 25, 1962, which stayed proceedings until August 7, 1962, "in the hope and expectation" that the General Assembly would take "some appropriate action" in the intervening 13 days. Sincock v. Terry, 207 F. Supp. 205, 207. By way of prodding, presumably, the court noted that if no legislative action were taken and the court sustained the plaintiffs' claim, "the present General Assembly and any subsequent General Assembly, the members of which were elected pursuant to Section 2 of Article 2 [the challenged provisions of the Delaware Constitution], might be held not to be a de jure legislature and its legislative acts might be held invalid and unconstitutional." Id., at 205-206. Five days later, on July 30, 1962, the General Assembly approved a proposed amendment to the State Constitution. On August 7, 1962, the District Court entered an order denying the *619 defendants' motion to dismiss. The court said that it did not wish to substitute its judgment "for the collective wisdom of the General Assembly of Delaware," but that "in the light of all the circumstances," it had to proceed promptly. 210 F. Supp. 395, 396. On October 16, 1962, the court declined to enjoin the conduct of elections in November. 210 F. Supp. 396. The court went on to express its regret that the General Assembly had not adopted the court's suggestion, see 207 F. Supp., at 206-207, that the Delaware Constitution be amended to make apportionment a statutory rather than a constitutional matter, so as to facilitate further changes in apportionment which might be required. 210 F. Supp., at 401. In January 1963, the General Assembly again approved the proposed amendment of the apportionment provisions of the Delaware Constitution, which thereby became effective on January 17, 1963.[79] Three months later, on April 17, 1963, the District Court reached "the reluctant conclusion" that Art. II, ง 2, of the Delaware Constitution was unconstitutional, with or without the 1963 amendment. Sincock v. Duffy, 215 F. Supp. 169, 189. Observing that "the State of Delaware, the General Assembly, and this court all seem to be trapped in a kind of box of time," id., at 191, the court gave the General Assembly until October 1, 1963, to adopt acceptable provisions for apportionment. On May 20, 1963, the District Court enjoined the defendants from conducting any elections, including the general election scheduled for November 1964, pursuant to the old or the new constitutional provisions.[80] This Court now approves all these *620 proceedings, noting particularly that in allowing the 1962 elections to go forward, "the District Court acted in a wise and temperate manner." Post, p. 710.[81]
Records such as these in the cases decided today are sure to be duplicated in most of the other States if they have not been already. They present a jarring picture of courts threatening to take action in an area which they have no business entering, inevitably on the basis of political judgments which they are incompetent to make. They show legislatures of the States meeting in haste and deliberating and deciding in haste to avoid the threat of judicial interference. So far as I can tell, the Court's only response to this unseemly state of affairs is ponderous insistence that "a denial of constitutionally protected rights demands judicial protection," ante, p. 566. By thus refusing to recognize the bearing which a potential for *621 conflict of this kind may have on the question whether the claimed rights are in fact constitutionally entitled to judicial protection, the Court assumes, rather than supports, its conclusion.
It should by now be obvious that these cases do not mark the end of reapportionment problems in the courts. Predictions once made that the courts would never have to face the problem of actually working out an apportionment have proved false. This Court, however, continues to avoid the consequences of its decisions, simply assuring us that the lower courts "can and . . . will work out more concrete and specific standards," ante, p. 578. Deeming it "expedient" not to spell out "precise constitutional tests," the Court contents itself with stating "only a few rather general considerations." Ibid.
Generalities cannot obscure the cold truth that cases of this type are not amenable to the development of judicial standards. No set of standards can guide a court which has to decide how many legislative districts a State shall have, or what the shape of the districts shall be, or where to draw a particular district line. No judicially manageable standard can determine whether a State should have single-member districts or multimember districts or some combination of both. No such standard can control the balance between keeping up with population shifts and having stable districts. In all these respects, the courts will be called upon to make particular decisions with respect to which a principle of equally populated districts will be of no assistance whatsoever. Quite obviously, there are limitless possibilities for districting consistent with such a principle. Nor can these problems be avoided by judicial reliance on legislative judgments so far as possible. Reshaping or combining one or two districts, or modifying just a few district lines, is no less a matter of choosing among many possible *622 solutions, with varying political consequences, than reapportionment broadside.[82]
The Court ignores all this, saying only that "what is marginally permissible in one State may be unsatisfactory in another, depending on the particular circumstances of the case," ante, p. 578. It is well to remember that the product of today's decisions will not be readjustment of a few districts in a few States which most glaringly depart from the principle of equally populated districts. It will be a redetermination, extensive in many cases, of legislative districts in all but a few States.
Although the Courtโnecessarily, as I believeโprovides only generalities in elaboration of its main thesis, its opinion nevertheless fully demonstrates how far removed these problems are from fields of judicial competence. Recognizing that "indiscriminate districting" is an invitation to "partisan gerrymandering," ante, pp. 578-579, the Court nevertheless excludes virtually every basis for the formation of electoral districts other than "indiscriminate districting." In one or another of today's opinions, the Court declares it unconstitutional for a State to give effective consideration to any of the following in establishing legislative districts:
(1) history;[83]
(2) "economic or other sorts of group interests";[84]
(3) area;[85]
(4) geographical considerations;[86]
(5) a desire "to insure effective representation for sparsely settled areas";[87]

*623 (6) "availability of access of citizens to their representatives";[88]
(7) theories of bicameralism (except those approved by the Court);[89]
(8) occupation;[90]
(9) "an attempt to balance urban and rural power."[91]
(10) the preference of a majority of voters in the State.[92]
So far as presently appears, the only factor which a State may consider, apart from numbers, is political subdivisions. But even "a clearly rational state policy" recognizing this factor is unconstitutional if "population is submerged as the controlling consideration . . . ."[93]
I know of no principle of logic or practical or theoretical politics, still less any constitutional principle, which establishes all or any of these exclusions. Certain it is that the Court's opinion does not establish them. So far as the Court says anything at all on this score, it says only that "legislators represent people, not trees or acres," ante, p. 562; that "citizens, not history or economic interests, cast votes," ante, p. 580; that "people, not land or trees or pastures, vote," ibid.[94] All this may be conceded. But it is surely equally obvious, and, in the context of elections, more meaningful to note that people are not ciphers and that legislators can represent their electors only by speaking *624 for their interestsโeconomic, social, politicalโmany of which do reflect the place where the electors live. The Court does not establish, or indeed even attempt to make a case for the proposition that conflicting interests within a State can only be adjusted by disregarding them when voters are grouped for purposes of representation.

CONCLUSION.
With these cases the Court approaches the end of the third round set in motion by the complaint filed in Baker v. Carr. What is done today deepens my conviction that judicial entry into this realm is profoundly ill-advised and constitutionally impermissible. As I have said before, Wesberry v. Sanders, supra, at 48, I believe that the vitality of our political system, on which in the last analysis all else depends, is weakened by reliance on the judiciary for political reform; in time a complacent body politic may result.
These decisions also cut deeply into the fabric of our federalism. What must follow from them may eventually appear to be the product of state legislatures. Nevertheless, no thinking person can fail to recognize that the aftermath of these cases, however desirable it may be thought in itself, will have been achieved at the cost of a radical alteration in the relationship between the States and the Federal Government, more particularly the Federal Judiciary. Only one who has an overbearing impatience with the federal system and its political processes will believe that that cost was not too high or was inevitable.
Finally, these decisions give support to a current mistaken view of the Constitution and the constitutional function of this Court. This view, in a nutshell, is that every major social ill in this country can find its cure in some constitutional "principle," and that this Court should "take the lead" in promoting reform when other branches of government fail to act. The Constitution is *625 not a panacea for every blot upon the public welfare, nor should this Court, ordained as a judicial body, be thought of as a general haven for reform movements. The Constitution is an instrument of government, fundamental to which is the premise that in a diffusion of governmental authority lies the greatest promise that this Nation will realize liberty for all its citizens. This Court, limited in function in accordance with that premise, does not serve its high purpose when it exceeds its authority, even to satisfy justified impatience with the slow workings of the political process. For when, in the name of constitutional interpretation, the Court adds something to the Constitution that was deliberately excluded from it, the Court in reality substitutes its view of what should be so for the amending process.
I dissent in each of these cases, believing that in none of them have the plaintiffs stated a cause of action. To the extent that Baker v. Carr, expressly or by implication, went beyond a discussion of jurisdictional doctrines independent of the substantive issues involved here, it should be limited to what it in fact was: an experiment in venturesome constitutionalism. I would reverse the judgments of the District Courts in Nos. 23, 27, and 41 (Alabama), No. 69 (Virginia), and No. 307 (Delaware), and remand with directions to dismiss the complaints. I would affirm the judgments of the District Courts in No. 20 (New York), and No. 508 (Colorado), and of the Court of Appeals of Maryland in No. 29.

APPENDIX A TO OPINION OF MR. JUSTICE HARLAN, DISSENTING.
Statements made in the House of Representatives during the debate on the resolution proposing the Fourteenth Amendment.[*]

*626 "As the nearest approach to justice which we are likely to be able to make, I approve of the second section that bases representation upon voters." 2463 (Mr. Garfield).
"Would it not be a most unprecedented thing that when this [former slave] population are not permitted where they reside to enter into the basis of representation in their own State, we should receive it as an element of representation here; that when they will not count them in apportioning their own legislative districts, we are to count them as five fifths (no longer as three fifths, for that is out of the question) as soon as you make a new apportionment?" 2464-2465 (Mr. Thayer).
"The second section of the amendment is ostensibly intended to remedy a supposed inequality in the basis of representation. The real object is to reduce the number of southern representatives in Congress and in the Electoral College; and also to operate as a standing inducement to negro suffrage." 2467 (Mr. Boyer).
"Shall the pardoned rebels of the South include in the basis of representation four million people to whom they deny political rights, and to no one of whom is allowed a vote in the selection of a Representative?" 2468 (Mr. Kelley).
"I shall, Mr. Speaker, vote for this amendment; not because I approve it. Could I have controlled the report of the committee of fifteen, it would have proposed to give the right of suffrage to every loyal man in the country." 2469 (Mr. Kelley).
"But I will ask, why should not the representation of the States be limited as the States themselves limit suffrage? . . . If the negroes of the South are *627 not to be counted as a political element in the government of the South in the States, why should they be counted as a political element in the government of the country in the Union?" 2498 (Mr. Broomall).
"It is now proposed to base representation upon suffrage, upon the number of voters, instead of upon the aggregate population in every State of the Union." 2502 (Mr. Raymond).
"We admit equality of representation based upon the exercise of the elective franchise by the people. The proposition in the matter of suffrage falls short of what I desire, but so far as it goes it tends to the equalization of the inequality at present existing; and while I demand and shall continue to demand the franchise for all loyal male citizens of this country โand I cannot but admit the possibility that ultimately those eleven States may be restored to representative power without the right of franchise being conferred upon the colored peopleโI should feel myself doubly humiliated and disgraced, and criminal even, if I hesitated to do what I can for a proposition which equalizes representation." 2508 (Mr. Boutwell).
"Now, conceding to each State the right to regulate the right of suffrage, they ought not to have a representation for male citizens not less than twenty-one years of age, whether white or black, who are deprived of the exercise of suffrage. This amendment will settle the complication in regard to suffrage and representation, leaving each State to regulate that for itself, so that it will be for it to decide whether or not it shall have a representation for all its male citizens not less than twenty-one years of age." 2510 (Mr. Miller).

*628 "Manifestly no State should have its basis of national representation enlarged by reason of a portion of citizens within its borders to which the elective franchise is denied. If political power shall be lost because of such denial, not imposed because of participation in rebellion or other crime, it is to be hoped that political interests may work in the line of justice, and that the end will be the impartial enfranchisement of all citizens not disqualified by crime. Whether that end shall be attained or not, this will be secured: that the measure of political power of any State shall be determined by that portion of its citizens which can speak and act at the polls, and shall not be enlarged because of the residence within the State of portions of its citizens denied the right of franchise. So much for the second section of the amendment. It is not all that I wish and would demand; but odious inequalities are removed by it and representation will be equalized, and the political rights of all citizens will under its operation be, as we believe, ultimately recognized and admitted." 2511 (Mr. Eliot).
"I have no doubt that the Government of the United States has full power to extend the elective franchise to the colored population of the insurgent States. I mean authority; I said power. I have no doubt that the Government of the United States has authority to do this under the Constitution; but I do not think they have the power. The distinction I make between authority and power is this: we have, in the nature of our Government, the right to do it; but the public opinion of the country is such at this precise moment as to make it impossible we should do it. It was therefore most wise on the part of the committee on reconstruction to waive this matter in deference to public opinion. The situation *629 of opinion in these States compels us to look to other means to protect the Government against the enemy." 2532 (Mr. Banks).
"If you deny to any portion of the loyal citizens of your State the right to vote for Representatives you shall not assume to represent them, and, as you have done for so long a time, misrepresent and oppress them. This is a step in the right direction; and although I should prefer to see incorporated into the Constitution a guarantee of universal suffrage, as we cannot get the required two thirds for that, I cordially support this proposition as the next best." 2539-2540 (Mr. Farnsworth).

APPENDIX B TO OPINION OF MR. JUSTICE HARLAN, DISSENTING.
Statements made in the Senate during the debate on the resolution proposing the Fourteenth Amendment.[*]
"The second section of the constitutional amendment proposed by the committee can be justified upon no other theory than that the negroes ought to vote; and negro suffrage must be vindicated before the people in sustaining that section, for it does not exclude the non-voting population of the North, because it is admitted that there is no wrong in excluding from suffrage aliens, females, and minors. But we say, if the negro is excluded from suffrage he shall also be excluded from the basis of representation. Why this inequality? Why this injustice? For injustice it would be unless there be some good reason for this discrimination against the South in excluding her non-voting population from the basis *630 of representation. The only defense that we can make to this apparent injustice is that the South commits an outrage upon human rights when she denies the ballot to the blacks, and we will not allow her to take advantage of her own wrong, or profit by this outrage. Does any one suppose it possible to avoid this plain issue before the people? For if they will sustain you in reducing the representation of the South because she does not allow the negro to vote, they will do so because they think it is wrong to disfranchise him." 2800 (Senator Stewart).
"It [the second section of the proposed amendment] relieves him [the Negro] from misrepresentation in Congress by denying him any representation whatever." 2801 (Senator Stewart).
"But I will again venture the opinion that it [the second section] means as if it read thus: no State shall be allowed a representation on a colored population unless the right of voting is given to the negroesโpresenting to the States the alternative of loss of representation or the enfranchisement of the negroes, and their political equality." 2939 (Senator Hendricks).
"I should be much better satisfied if the right of suffrage had been given at once to the more intelligent of them [the Negroes] and such as had served in our Army. But it is believed by wiser ones than myself that this amendment will very soon produce some grant of suffrage to them, and that the craving for political power will ere long give them universal suffrage.. . . Believing that this amendment probably goes as far in favor of suffrage to the negro as is practicable to accomplish now, and hoping it may in *631 the end accomplish all I desire in this respect, I shall vote for its adoption, although I should be glad to go further." 2963-2964 (Senator Poland).
"What is to be the operation of this amendment? Just this: your whip is held over Pennsylvania, and you say to her that she must either allow her negroes to vote or have one member of Congress less." 2987 (Senator Cowan).
"Now, sir, in all the Statesโcertainly in mine, and no doubt in allโthere are local as contradistinguished from State elections. There are city elections, county elections, and district or borough elections; and those city and county and district elections are held under some law of the State in which the city or county or district or borough may be; and in those elections, according to the laws of the States, certain qualifications are prescribed, residence within the limits of the locality and a property qualification in some. Now, is it proposed to say that if every man in a State is not at liberty to vote at a city or a country or a borough election that is to affect the basis of representation?" 2991 (Senator Johnson).
"Again, Mr. President, the measure upon the table, like the first proposition submitted to the Senate from the committee of fifteen, concedes to the States . . . not only the right, but the exclusive right, to regulate the franchise. . . . It says that each of the southern States, and, of course, each other State in the Union, has a right to regulate for itself the franchise, and that consequently, as far as the Government of the United States is concerned, if the black man is not permitted the right to the franchise, it will be a wrong (if a wrong) which the Government *632 of the United States will be impotent to redress." 3027 (Senator Johnson).
"The amendment fixes representation upon numbers, precisely as the Constitution now does, but when a State denies or abridges the elective franchise to any of its male inhabitants who are citizens of the United States and not less than twenty-one years of age, except for participation in rebellion or other crime, then such State will lose its representation in Congress in the proportion which the male citizen so excluded bears to the whole number of male citizens not less than twenty-one years of age in the State." 3033 (Senator Henderson).
NOTES
[*] Together with No. 27, Vann et al. v. Baggett, Secretary of State of Alabama, et al., and No. 41, McConnell et al. v. Baggett, Secretary of State of Alabama, et al., also on appeal from the same court.
[1] Sims v. Frink, 208 F. Supp. 431 (D. C. M. D. Ala. 1962). All decisions of the District Court in this litigation are reported sub nom. Sims v. Frink.
[2] Included among the defendants were the Secretary of State and the Attorney General of Alabama, the Chairmen and Secretaries of the Alabama State Democratic Executive Committee and the State Republican Executive Committee, and three Judges of Probate of three counties, as representatives of all the probate judges of Alabama.
[3] Provisions virtually identical to those contained in Art. IX, งง 202 and 203, were enacted into the Alabama Codes of 1907 and 1923, and were most recently reenacted as statutory provisions in งง 1 and 2 of Tit. 32 of the 1940 Alabama Code (as recompiled in 1958).
[4] See Opinion of the Justices, 263 Ala. 158, 164, 81 So. 2d 881, 887 (1955), and Opinion of the Justices, 254 Ala. 185, 187, 47 So. 2d 714, 717 (1950), referred to by the District Court in its preliminary opinion. 205 F. Supp. 245, 247.
[5] See Ex parte Rice, 273 Ala. 712, 143 So. 2d 848 (1962), where the Alabama Supreme Court, on May 9, 1962, subsequent to the District Court's preliminary order in the instant litigation as well as our decision in Baker v. Carr, 369 U. S. 186, refused to review a denial of injunctive relief sought against the conducting of the 1962 primary election until after reapportionment of the Alabama Legislature, stating that "this matter is a legislative function, and . . . the Court has no jurisdiction. . . ." And in Waid v. Pool, 255 Ala. 441, 51 So. 2d 869 (1951), the Alabama Supreme Court, in a similar suit, had stated that the lower court had properly refused to grant injunctive relief because "appellants . . . are seeking interference by the judicial department of the state in respect to matters committed by the constitution to the legislative department." 255 Ala., at 442, 51 So. 2d, at 870.
[6] Under 28 U. S. C. งง 2281 and 2284.
[7] During the over 60 years since the last substantial reapportionment in Alabama, the State's population increased from 1,828,697 to 3,244,286. Virtually all of the population gain occurred in urban counties, and many of the rural counties incurred sizable losses in population.
[8] See 369 U. S., at 260 (CLARK, J., concurring).
[9] Proposed Constitutional Amendment No. 1 of 1962, Alabama Senate Bill No. 29, Act No. 93, Acts of Alabama, Special Session, 1962, p. 124. The text of the proposed amendment is set out as Appendix B to the lower court's opinion. 208 F. Supp., at 443-444.
[10] For a discussion of this method of apportionment, used in distributing seats in the Federal House of Representatives among the States, and other commonly used apportionment methods, see Schmeckebier, The Method of Equal Proportions, 17 Law & Contemp. Prob. 302 (1952).
[11] Alabama Reapportionment Act of 1962, Alabama House Bill No. 59, Act No. 91, Acts of Alabama, Special Session, 1962, p. 121. The text of the act is reproduced as Appendix C to the lower court's opinion. 208 F. Supp., at 445-446.
[12] A comprehensive chart showing the representation by counties in the Alabama House of Representatives under the existing apportionment provisions is set out as Appendix D to the lower court's opinion. 208 F. Supp., at 447-449. This chart includes the number of House seats given to each county, and the populations of the 67 Alabama counties under the 1900, 1950, and 1960 censuses.
[13] Although cross-appellants in No. 27 assert that the Alabama Constitution forbids the division of a county, in forming senatorial districts, only when one or both pieces will be joined with another county to form a multicounty district, this view appears to be contrary to the language of Art. IX, ง 200, of the Alabama Constitution and the practice under it. Cross-appellants contend that counties entitled by population to two or more senators can be split into the appropriate number of districts, and argue that prior to the adoption of the 1901 provisions the Alabama Constitution so provided and there is no reason to believe that the language of the present provision was intended to effect any change. However, the only apportionments under the 1901 Alabama Constitutionโthe 1901 provisions and the Crawford-Webb Actโgave no more than one seat to a county even though by population several counties would have been entitled to additional senatorial representation.
[14] A chart showing the composition, by counties, of the 35 senatorial districts provided for under the existing apportionment, and the population of each according to the 1900, 1950, and 1960 censuses, is reproduced as Appendix E to the lower court's opinion. 208 F. Supp., at 450.
[15] 208 F. Supp., at 437.
[16] Id., at 438.
[17] According to the District Court, in the interval between its preliminary order and its decision on the merits, the Alabama Legislature, despite adopting this constitutional amendment proposal, "refused to inquire of the Supreme Court of the State of Alabama whether this provision in the Constitution of the State of Alabama could be changed by constitutional amendment as the `67-Senator Amendment' proposes." 208 F. Supp., at 437.
[18] At least this is the reading of the District Court of two somewhat conflicting decisions by the Alabama Supreme Court, resulting in a "manifest uncertainty of the legality of the proposed constitutional amendment, as measured by State standards . . . ." 208 F. Supp., at 438. Compare Opinion of the Justices, 254 Ala. 183, 184, 47 So. 2d 713, 714 (1950), with Opinion of the Justices, 263 Ala. 158, 164, 81 So. 2d 881, 887 (1955).
[19] See the later discussion, infra, at 568-569, and note 68, infra, where we reject the lower court's apparent conclusion that the apportionment of the Alabama House, under the 67-Senator Amendment, comported with the requirements of the Equal Protection Clause.
[20] While no formula for the statute's apportionment of representatives is expressly stated, one can be extrapolated. Counties with less than 45,000 people are given one seat; those with 45,000 to 90,000 receive two seats; counties with 90,000 to 150,000, three seats; those with 150,000 to 300,000, four seats; counties with 300,000 to 600,000, six seats; and counties with over 600,000 are given 12 seats.
[21] Appendix F to the lower court's opinion sets out a chart showing the populations of the 35 senatorial districts provided for under the Crawford-Webb Act and the composition, by counties, of the various districts. 208 F. Supp., at 451.
[22] Cross-appellants in No. 27 assert that the Crawford-Webb Act was a "minimum-change measure" which merely redrew new senatorial district lines around the nominees of the May 1962 Democratic primary so as to retain the seats of 34 of the 35 nominees, and resulted, in practical effect, in the shift of only one Senate seat from an overrepresented district to another underpopulated, newly created district.
[23] 208 F. Supp., at 439.
[24] Possibly this resulted from an understandable desire on the part of the Alabama Legislature to await a final determination by this Court in the instant litigation before proceeding to enact a permanent apportionment plan.
[25] However, a proposed constitutional amendment, which would have made the Alabama House of Representatives somewhat more representative of population but the Senate substantially less so, was rejected by the people in a 1956 referendum, with the more populous counties accounting for the defeat.

See the discussion in Lucas v. Forty-Fourth General Assembly of Colorado, post, pp. 736-737, decided also this date, with respect to the lack of federal constitutional significance of the presence or absence of an available political remedy.
[26] Ala. Const., Art. XVIII, ง 284.
[27] Ala. Const., Art. XVIII, ง 286.
[28] The Fifteenth, Seventeenth, Nineteenth, Twenty-third and Twenty-fourth Amendments to the Federal Constitution all involve expansions of the right of suffrage. Also relevant, in this regard, is the civil rights legislation enacted by Congress in 1957 and 1960.
[29] As stated by MR. JUSTICE DOUGLAS, dissenting, in South v. Peters, 339 U. S. 276, 279:

"There is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth. The right to vote includes the right to have the ballot counted. . . . It also includes the right to have the vote counted at full value without dilution or discount. . . . That federally protected right suffers substantial dilution . . . [where a] favored group has full voting strength . . . [and] [t]he groups not in favor have their votes discounted."
[30] Litigation challenging the constitutionality of state legislative apportionment schemes had been instituted in at least 34 States prior to the end of 1962โwithin nine months of our decision in Baker v. Carr. See McKay, Political Thickets and Crazy Quilts: Reapportionment and Equal Protection, 61 Mich. L. Rev. 645, 706-710 (1963), which contains an appendix summarizing reapportionment litigation through the end of 1962. See also David and Eisenberg, Devaluation of the Urban and Suburban Vote (1961); Goldberg, The Statistics of Malapportionment, 72 Yale L. J. 90 (1962).
[31] 369 U. S., at 198.
[32] Id., at 226.
[33] Scholle v. Hare, 369 U. S. 429 (Michigan); WMCA, Inc., v. Simon, 370 U. S. 190 (New York).
[34] 372 U. S., at 379-380.
[35] Id., at 381.
[36] Id., at 376. Later in the opinion we again stated:

"Nor does the question here have anything to do with the composition of the state or federal legislature. And we intimate no opinion on the constitutional phases of that problem beyond what we said in Baker v. Carr . . . ." Id., at 378.
[37] 376 U. S., at 14.
[38] Id., at 17-18.
[39] As stated by MR. JUSTICE DOUGLAS, the rights sought to be vindicated in a suit challenging an apportionment scheme are "personal and individual," South v. Peters, 339 U. S., at 280, and are "important political rights of the people," MacDougall v. Green, 335 U. S. 281, 288. (DOUGLAS, J., dissenting.)
[40] As stated by MR. JUSTICE BLACK, dissenting, in Colegrove v. Green, 328 U. S. 549, 569-571:

"No one would deny that the equal protection clause would . . . prohibit a law that would expressly give certain citizens a half-vote and others a full vote. . . . [T]he constitutionally guaranteed right to vote and the right to have one's vote counted clearly imply the policy that state election systems, no matter what their form, should be designed to give approximately equal weight to each vote cast. . . . [A] state legislature cannot deny eligible voters the right to vote for Congressmen and the right to have their vote counted. It can no more destroy the effectiveness of their vote in part and no more accomplish this in the name of `apportionment' than under any other name."
[41] 376 U. S., at 8. See also id., at 17, quoting from James Wilson, a delegate to the Constitutional Convention and later an Associate Justice of this Court, who stated:

"[A]ll elections ought to be equal. Elections are equal, when a given number of citizens, in one part of the state, choose as many representatives, as are chosen by the same number of citizens, in any other part of the state. In this manner, the proportion of the representatives and of the constituents will remain invariably the same." 2 The Works of James Wilson (Andrews ed. 1896) 15.
And, as stated by MR. JUSTICE DOUGLAS, dissenting, in MacDougall v. Green, 335 U. S., at 288, 290:
"[A] regulation . . . [which] discriminates against the residents of the populous counties of the state in favor of rural sections . . . lacks the equality to which the exercise of political rights is entitled under the Fourteenth Amendment.
"Free and honest elections are the very foundation of our republican form of government. . . . Discrimination against any group or class of citizens in the exercise of these constitutionally protected rights of citizenship deprives the electoral process of integrity. . . .
"None would deny that a state law giving some citizens twice the vote of other citizens in either the primary or general election would lack that equality which the Fourteenth Amendment guarantees. . . . The theme of the Constitution is equality among citizens in the exercise of their political rights. The notion that one group can be granted greater voting strength than another is hostile to our standards for popular representative government."
[42] 364 U. S., at 347.
[43] Although legislative apportionment controversies are generally viewed as involving urban-rural conflicts, much evidence indicates that presently it is the fast-growing suburban areas which are probably the most seriously underrepresented in many of our state legislatures. And, while currently the thrust of state legislative malapportionment results, in most States, in underrepresentation of urban and suburban areas, in earlier times cities were in fact overrepresented in a number of States. In the early 19th century, certain of the seaboard cities in some of the Eastern and Southern States possessed and struggled to retain legislative representation disproportionate to population, and bitterly opposed according additional representation to the growing inland areas. Conceivably, in some future time, urban areas might again be in a situation of attempting to acquire or retain legislative representation in excess of that to which, on a population basis, they are entitled. Malapportionment can, and has historically, run in various directions. However and whenever it does, it is constitutionally impermissible under the Equal Protection Clause.
[44] The British experience in eradicating "rotten boroughs" is interesting and enlightening. Parliamentary representation is now based on districts of substantially equal population, and periodic reapportionment is accomplished through independent Boundary Commissions. For a discussion of the experience and difficulties in Great Britain in achieving fair legislative representation, see Edwards, Theoretical and Comparative Aspects of Reapportionment and Redistricting: With Reference to Baker v. Carr, 15 Vand. L. Rev. 1265, 1275 (1962). See also the discussion in Baker v. Carr, 369 U. S., at 302-307. (Frankfurter, J., dissenting.)
[45] Under the existing scheme, Marshall County, with a 1960 population of 48,018, Baldwin County, with 49,088, and Houston County, with 50,718, are each given only one seat in the Alabama House, while Bullock County, with only 13,462, Henry County, with 15,286, and Lowndes County, with 15,417, are allotted two representatives each. And in the Alabama Senate, under the existing apportionment, a district comprising Lauderdale and Limestone Counties had a 1960 population of 98,135, and another composed of Lee and Russell Counties had 96,105. Conversely, Lowndes County, with only 15,417, and Wilcox County, with 18,739, are nevertheless single-county senatorial districts given one Senate seat each.
[46] An interesting pre-Baker discussion of the problem of legislative malapportionment in Alabama is provided in Comment, Alabama's Unrepresentative Legislature, 14 Ala. L. Rev. 403 (1962).
[47] See the cases cited and discussed in notes 4-5, supra, where the Alabama Supreme Court refused even to consider the granting of relief in suits challenging the validity of the apportionment of seats in the Alabama Legislature, although it stated that the legislature had failed to comply with the requirements of the State Constitution with respect to legislative reapportionment.
[48] However, since the District Court found the proposed constitutional amendment prospectively invalid, it was never in fact voted upon by the State's electorate.
[49] Resemblances between the system of representation in the Federal Congress and the apportionment scheme embodied in the 67-Senator Amendment appear to be more superficial than actual. Representation in the Federal House of Representatives is apportioned by the Constitution among the States in conformity with population. While each State is guaranteed at least one seat in the House, as a feature of our unique federal system, only four States have less than 1/435 of the country's total population, under the 1960 census. Thus, only four seats in the Federal House are distributed on a basis other than strict population. In Alabama, on the other hand, 40 of the 67 counties have less than 1/106 of the State's total population. Thus, under the proposed amendment, over 1/3 of the total number of seats in the Alabama House would be distributed on a basis other than strict population. States with almost 50% of the Nation's total population are required in order to elect a majority of the members of the Federal House, though unfair districting within some of the States presently reduces to about 42% the percentage of the country's population which reside in districts electing individuals comprising a majority in the Federal House. Cf. Wesberry v. Sanders, supra, holding such congressional districting unconstitutional. Only about 43% of the population of Alabama would live in districts which could elect a majority in the Alabama House, under the proposed constitutional amendment. Thus, it could hardly be argued that the proposed apportionment of the Alabama House was based on population in a way comparable to the apportionment of seats in the Federal House among the States.
[50] For a thorough statement of the arguments against holding the so-called federal analogy applicable to state legislative apportionment matters, see, e. g., McKay, Reapportionment and the Federal Analogy (National Municipal League pamphlet 1962); McKay, The Federal Analogy and State Apportionment Standards, 38 Notre Dame Law. 487 (1963). See also Merrill, Blazes for a Trail Through the Thicket of Reapportionment, 16 Okla. L. Rev. 59, 67-70 (1963).
[51] 208 F. Supp., at 438. See the discussion of the District Court's holding as to the applicability of the federal analogy earlier in this opinion, supra, at 547-548.
[52] Report of Advisory Commission on Intergovernmental Relations, Apportionment of State Legislatures 10-11, 35, 69 (1962).
[53] Thomas Jefferson repeatedly denounced the inequality of representation provided for under the 1776 Virginia Constitution and frequently proposed changing the State Constitution to provide that both houses be apportioned on the basis of population. In 1816 he wrote that "a government is republican in proportion as every member composing it has his equal voice in the direction of its concerns. . . by representatives chosen by himself . . . ." Letter to Samuel Kercheval, 10 Writings of Thomas Jefferson (Ford ed. 1899) 38. And a few years later, in 1819, he stated: "Equal representation is so fundamental a principle in a true republic that no prejudice can justify its violation because the prejudices themselves cannot be justified." Letter to William King, Jefferson Papers, Library of Congress, Vol. 216, p. 38616.
[54] Article II, ง 14, of the Northwest Ordinance of 1787 stated quite specifically: "The inhabitants of the said territory shall always be entitled to the benefits . . . of a proportionate representation of the people in the Legislature."
[55] See the discussion in Wesberry v. Sanders, 376 U. S., at 9-14.
[56] 372 U. S., at 378.
[57] As stated by the Court in Bain Peanut Co. v. Pinson, 282 U. S. 499, 501, "We must remember that the machinery of government would not work if it were not allowed a little play in its joints."
[58] But cf. the discussion of some of the practical problems inherent in the use of multimember districts in Lucas v. Forty-Fourth General Assembly of Colorado, post, pp. 731-732, decided also this date.
[59] See the discussion of the concept of floterial districts in Davis v. Mann, post, pp. 686-687, n. 2, decided also this date.
[60] For a discussion of the formal apportionment formulae prescribed for the allocation of seats in state legislatures, see Dixon, Apportionment Standards and Judicial Power, 38 Notre Dame Law. 367, 398-400 (1963). See also The Book of the States 1962-1963, 58-62.
[61] In rejecting a suggestion that the representation of the newer Western States in Congress should be limited so that it would never exceed that of the original States, the Constitutional Convention plainly indicated its view that history alone provided an unsatisfactory basis for differentiations relating to legislative representation. See Wesberry v. Sanders, 376 U. S., at 14. Instead, the Northwest Ordinance of 1787, in explicitly providing for population-based representation of those living in the Northwest Territory in their territorial legislatures, clearly implied that, as early as the year of the birth of our federal system, the proper basis of legislative representation was regarded as being population.
[62] See McKay, Political Thickets and Crazy Quilts: Reapportionment and Equal Protection, 61 Mich. L. Rev. 645, 698-699 (1963).
[63] Determining the size of its legislative bodies is of course a matter within the discretion of each individual State. Nothing in this opinion should be read as indicating that there are any federal constitutional maximums or minimums on the size of state legislative bodies.
[64] See 369 U. S., at 217-232, discussing the nonjusticiability of malapportionment claims asserted under the Guaranty Clause.
[65] Report of Advisory Commission on Intergovernmental Relations, Apportionment of State Legislatures 56 (1962). Additionally, the constitutions of seven other States either require or permit reapportionment of legislative representation more frequently than every 10 years. See also The Book of the States 1962-1963, 58-62.
[66] Cf. Baker v. Carr, 369 U. S. 186, 198. See also 369 U. S., at 250-251 (DOUGLAS, J., concurring), and passages from Baker quoted in this opinion, supra, at 556, 557, and infra.
[67] 369 U. S., at 250.
[68] Although the District Court indicated that the apportionment of the Alabama House under the 67-Senator Amendment was valid and acceptable, we of course reject that determination, which we regard as merely precatory and advisory since the court below found the overall plan, under the proposed constitutional amendment, to be unconstitutional. See 208 F. Supp., at 440-441. See the discussion earlier in this opinion, supra, at 568-569.
[*] Incidentally, neither of these cases, upon which the Court bases its opinion, is apposite. Gray involved the use of Georgia's county unit rule in the election of United States Senators and Wesberry was a congressional apportionment case.
[*] [This opinion applies also to No. 20, WMCA, Inc., et al. v. Lomenzo, Secretary of State of New York, et al., post, p. 633; No. 29, Maryland Committee for Fair Representation et al. v. Tawes, Governor, et al., post, p. 656; No. 69, Davis, Secretary, State Board of Elections, et al. v. Mann et al., post, p. 678; No. 307, Roman, Clerk, et al. v. Sincock et al., post, p. 695; and No. 508, Lucas et al. v. Forty-Fourth General Assembly of Colorado et al., post, p. 713.]
[1] Alabama, Colorado, Delaware, Maryland, New York, Virginia.
[2] In the Virginia case, Davis v. Mann, post, p. 678, the defendants introduced an exhibit prepared by the staff of the Bureau of Public Administration of the University of Virginia in which the Virginia Legislature, now held to be unconstitutionally apportioned, was ranked eighth among the 50 States in "representativeness," with population taken as the basis of representation. The Court notes that before the end of 1962, litigation attacking the apportionment of state legislatures had been instituted in at least 34 States. Ante, p. 556, note 30. See infra, pp. 610-611.
[3] See Baker v. Carr, 369 U. S. 186, 330, and the dissenting opinion of Frankfurter, J., in which I joined, id., at 266; Gray v. Sanders, 372 U. S. 368, 382; Wesberry v. Sanders, 376 U. S. 1, 20.
[4] That clause, which manifestly has no bearing on the claims made in these cases, see V Elliot's Debates on the Adoption of the Federal Constitution (1845), 332-333, could not in any event be the foundation for judicial relief. Luther v. Borden, 7 How. 1, 42-44; Ohio ex rel. Bryant v. Akron Metropolitan Park District, 281 U. S. 74, 79-80; Highland Farms Dairy, Inc., v. Agnew, 300 U. S. 608, 612. In Baker v. Carr, supra, at 227, the Court stated that reliance on the Republican Form of Government Clause "would be futile."
[5] It is fair to say that, beyond discussion of a large number of cases having no relevance to this question, the Court's views on this subject were fully stated in the compass of a single sentence: "Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects no policy, but simply arbitrary and capricious action." 369 U. S., at 226.

Except perhaps for the "crazy quilt" doctrine of my Brother CLARK, 369 U. S., at 251, nothing is added to this by any of the concurring opinions, id., at 241, 265.
[6] The cryptic remands in Scholle v. Hare, 369 U. S. 429, and WMCA, Inc., v. Simon, 370 U. S. 190, on the authority of Baker, had nothing to say on the question now before the Court.
[7] See the Journal of the Committee, reprinted in Kendrick, The Journal of the Joint Committee of Fifteen on Reconstruction (1914), 83-117.
[8] See the debates in Congress, Cong. Globe, 39th Cong., 1st Sess., 2459-3149, Passim (1866) (hereafter Globe).
[9] Globe 3040.
[10] Globe 2265, 2286.
[11] As reported in the House. Globe 2286. For prior versions of the Amendment in the Reconstruction Committee, see Kendrick, op. cit., supra, note 7, 83-117. The work of the Reconstruction Committee is discussed in Kendrick, supra, and Flack, The Adoption of the Fourteenth Amendment (1908), 55-139, passim.
[12] Globe 2459.
[13] Ibid. Stevens was referring to a proposed amendment to the Constitution which provided that "whenever the elective franchise shall be denied or abridged in any State on account of race or color, all persons therein of such race or color shall be excluded from the basis of representation." Globe 535. It passed the House, id., at 538, but did not muster the necessary two-thirds vote in the Senate, id., at 1289.
[14] Globe 2459.
[15] Ibid.
[16] Ibid.
[17] Ibid.
[18] Globe 2460.
[19] Kendrick, op. cit., supra, note 7, 87, 106; Flack, op. cit., supra, note 11, 60-68, 71.
[20] Globe 2542.
[21] Ibid. It is evident from the context of the reference to a republican government that Bingham did not regard limitations on the right to vote or the denial of the vote to specified categories of individuals as violating the guarantee of a republican form of government.
[22] Ibid.
[23] Representative Rogers, who voted against the resolution, Globe 2545, suggested that the right to vote might be covered by the Privileges and Immunities Clause. Globe 2538. But immediately thereafter he discussed the possibility that the Southern States might "refuse to allow the negroes to vote." Ibid.
[24] Globe 2545.
[25] Globe 2766.
[26] Ibid.
[27] Ibid.
[28] Globe 3042.
[29] Globe 3149.
[30] Such evidence as there is, mostly committee reports and messages to the legislatures from Governors of the States, is to the same effect as the evidence from the debates in the Congress. See Ark. House J. 288 (1866-1867); Fla. Sen. J. 8-10 (1866); Ind. House J. 47-48, 50-51 (1867); Mass. Legis. Doc., House Doc. No. 149, 4-14, 16-17, 23, 24, 25-26 (1867); Mo. Sen. J. 14 (1867); N. J. Sen. J. 7 (Extra Sess. 1866); N. C. Sen. J. 96-97, 98-99 (1866-1867); Tenn. House J. 12-15 (1865-1866); Tenn. Sen. J. 8 (Extra Sess. 1866); Va. House J. & Doc., Doc. No. 1, 35 (1866-1867); Wis. Sen. J. 33, 101-103 (1867). Contra: S. C. House J. 34 (1866); Tex. Sen. J. 422 (1866 App.).

For an account of the proceedings in the state legislatures and citations to the proceedings, see Fairman, "Does the Fourteenth Amendment Incorporate the Bill of Rights?" 2 Stan. L. Rev. 5, 81-126 (1949).
[31] Conn. Const., 1818, Art. Third, ง 3 (towns); N. H. Const., 1792, Part Second, ง XXVI (direct taxes paid); N. J. Const., 1844, Art. IV, ง II, cl. 1 (counties); R. I. Const., 1842, Art. VI, ง 1 (towns and cities); Vt. Const., 1793, c. II, ง 7 (towns).

In none of these States was the other House apportioned strictly according to population. Conn. Const., 1818, Amend. II; N. H. Const., 1792, Part Second, งง IX-XI; N. J. Const., 1844, Art. IV, ง III, cl. 1; R. I. Const., 1842, Art. V, ง 1; Vt. Const., 1793, Amend. 23.
[32] Iowa Const., 1857, Art. III, ง 35; Kan. Const., 1859, Art. 2, ง 2, Art. 10, ง 1; Me. Const., 1819, Art. IV-Part First, ง 3; Mich. Const., 1850, Art. IV, ง 3; Mo. Const., 1865, Art. IV, ง 2; N. Y. Const., 1846, Art. III, ง 5; Ohio Const., 1851, art. XI, งง 2-5; Pa. Const., 1838, Art. I, งง 4, 6, 7, as amended; Tenn. Const., 1834, Art. II, ง 5; W. Va. Const., 1861-1863, Art. IV, ง 9.
[33] Ninth Census of the United States, Statistics of Population (1872) (hereafter Census), 49. The population figures, here and hereafter, are for the year 1870, which presumably best reflect the figures for the years 1866-1870. Only the figures for 1860 were available at that time, of course, and they would have been used by anyone interested in population statistics. See, e. g., Globe 3028 (remarks of Senator Johnson).

The method of apportionment is contained in N. J. Const., 1844, Art. IV, ง II, cl. 1.
[34] N. J. Const., 1844, Art. IV. ง III, cl. 1. Census 49.
[35] Ibid.
[36] N. Y. Const., 1846, Art. III, งง 2, 5. Census 50-51.
[37] Ibid.
[38] Ibid.
[39] There were 14 counties, Census 67, each of which was entitled to at least one out of a total of 30 seats. Vt. Const., 1793, Amend. 23.
[40] Census 67.
[41] Act of Mar. 2, 1867, ง 5, 14 Stat. 429. See also Act of June 25, 1868, 15 Stat. 73, declaring that the States of North Carolina, South Carolina, Louisiana, Georgia, Alabama, and Florida, would be admitted to representation in Congress when their legislatures had ratified the Fourteenth Amendment. Other conditions were also imposed, including a requirement that Georgia nullify certain provisions of its Constitution. Ibid. Arkansas, which had already ratified the Fourteenth Amendment, was readmitted by Act of June 22, 1868, 15 Stat. 72. Virginia was readmitted by Act of Jan. 26, 1870, 16 Stat. 62; Mississippi by Act of Feb. 23, 1870, 16 Stat. 67; and Texas by Act of Mar. 30, 1870, 16 Stat. 80. Georgia was not finally readmitted until later, by Act of July 15, 1870, 16 Stat. 363.
[42] Discussing the bill which eventuated in the Act of June 25, 1868, see note 41, supra, Thaddeus Stevens said:

"Now, sir, what is the particular question we are considering? Five or six States have had submitted to them the question of forming constitutions for their own government. They have voluntarily formed such constitutions, under the direction of the Government of the United States. . . . They have sent us their constitutions. Those constitutions have been printed and laid before us. We have looked at them; we have pronounced them republican in form; and all we propose to require is that they shall remain so forever. Subject to this requirement, we are willing to admit them into the Union." Cong. Globe, 40th Cong., 2d Sess., 2465 (1868). See also the remarks of Mr. Butler, infra, p. 606.
The close attention given the various Constitutions is attested by the Act of June 25, 1868, which conditioned Georgia's readmission on the deletion of "the first and third subdivisions of section seventeen of the fifth article of the constitution of said State, except the proviso to the first subdivision . . . ." 15 Stat. 73. The sections involved are printed in Sen. Ex. Doc. No. 57, 40th Cong., 2d Sess., 14-15.
Compare United States v. Florida, 363 U. S. 121, 124-127.
[43] See, e. g., Cong. Globe, 40th Cong., 2d Sess., 2412-2413, 2858-2860, 2861-2871, 2895-2900, 2901-2904, 2927-2935, 2963-2970, 2998-3022, 3023-3029 (1868).
[44] Cong. Globe, 40th Cong., 2d Sess., 3090-3091 (1868).
[45] Id., at 3092.
[46] Ala. Const., 1867, Art. VIII, ง 1; Fla. Const., 1868, Art. XIV; Ga. Const., 1868, Art. III, ง 3, ถ 1; La. Const., 1868, Tit. II, Art. 20; N. C. Const., 1868, Art. II, ง 6; S. C. Const., 1868, Art. II, งง 6, 8.
[47] N. C. Const., 1868, Art. II, ง 6. There were 90 counties. Census 52-53.
[48] Ibid.
[49] S. C. Const., 1868, Art. II, ง 8; Census 60.
[50] Fla. Const., 1868, Art. XIV.
[51] Census 18-19.
[52] Ala. Const., 1875, Art. IX, งง 2, 3; Ala. Const., 1901, Art. IX, งง 198, 199.
[53] Fla. Const., 1885, Art. VII, ง 3.
[54] Ga. Const., 1877, Art. III, ง III.
[55] La. Const., 1879, Art. 16.
[56] Miss. Const., 1890, Art. 13, ง 256.
[57] Mo. Const., 1875, Art. IV, ง 2.
[58] Mont. Const., 1889, Art. V, ง 4, Art. VI, ง 4.
[59] N. H. Const., 1792, Part Second, งง IX-XI, XXVI, as amended.
[60] N. H. Const., 1902, Part Second, Arts. 9, 10, 25.
[61] N. Y. Const., 1894, Art. III, ง 4.
[62] N. Y. Const., 1894, Art. III, ง 5.
[63] N. C. Const., 1876, Art. II, ง 5.
[64] Okla. Const., 1907, Art. V, ง 10.
[65] Pa. Const., 1873, Art. II, ง 17.
[66] S. C. Const., 1895, Art. III, งง 4, 6.
[67] Utah Const., 1895, Art. IX, ง 4.
[68] Wyo. Const., 1889, Art. III, ง 3.
[69] A tabular presentation of constitutional provisions for apportionment as of Nov. 1, 1961, appears in The Book of the States 1962-1963, 58-62. Using this table, but disregarding some deviations from a pure population base, the Advisory Commission on Intergovernmental Relations states that there are 15 States in which the legislatures are apportioned solely according to population. Apportionment of State Legislatures (1962), 12.
[70] Compare the Court's statement in Guinn v. United States, 238 U. S. 347, 362:

". . . Beyond doubt the [Fifteenth] Amendment does not take away from the state governments in a general sense the power over suffrage which has belonged to those governments from the beginning and without the possession of which power the whole fabric upon which the division of state and national authority under the Constitution and the organization of both governments rest would be without support and both the authority of the nation and the State would fall to the ground. In fact, the very command of the Amendment recognizes the possession of the general power by the State, since the Amendment seeks to regulate its exercise as to the particular subject with which it deals."
[71] The quoted phrases are taken from the Jurisdictional Statement, pp. 13, 19.
[72] In two early cases dealing with party primaries in Texas, the Court indicated that the Equal Protection Clause did afford some protection of the right to vote. Nixon v. Herndon, 273 U. S. 536; Nixon v. Condon, 286 U. S. 73. Before and after these cases, two cases dealing with the qualifications for electors in Oklahoma had gone off on the Fifteenth Amendment, Guinn v. United States, 238 U. S. 347; Lane v. Wilson, 307 U. S. 268. The rationale of the Texas cases is almost certainly to be explained by the Court's reluctance to decide that party primaries were a part of the electoral process for purposes of the Fifteenth Amendment. See Newberry v. United States, 256 U. S. 232. Once that question was laid to rest in United States v. Classic, 313 U. S. 299, the Court decided subsequent cases involving Texas party primaries on the basis of the Fifteenth Amendment. Smith v. Allwright, 321 U. S. 649; Terry v. Adams, 345 U. S. 461.

The recent decision in Gomillion v. Lightfoot, 364 U. S. 339, that a constitutional claim was stated by allegations that municipal lines had been redrawn with the intention of depriving Negroes of the right to vote in municipal elections was based on the Fifteenth Amendment. Only one Justice, in a concurring opinion, relied on the Equal Protection Clause of the Fourteenth Amendment. Id., at 349.
[73] The measures were adopted on July 12, 1962. The District Court handed down its opinion on July 21, 1962.
[74] In reversing an initial order of the Circuit Court for Anne Arundel County dismissing the plaintiffs' complaint, the Maryland Court of Appeals directed the lower court to hear evidence on and determine the plaintiffs' constitutional claims, and, if it found provisions of the Maryland Constitution to be invalid, to "declare that the Legislature has the power, if called into Special Session by the Governor and such action be deemed appropriate by it, to enact a bill reapportioning its membership for purposes of the November, 1962, election." Maryland Committee for Fair Representation v. Tawes, 228 Md. 412, 438-439, 180 A. 2d 656, 670. On remand, the opinion of the Circuit Court included such a declaration. The opinion was filed on May 24, 1962. The Maryland Legislature, in Special Session, adopted the "emergency" measures now declared unconstitutional seven days later, on May 31, 1962.
[75] The Virginia Constitution, Art. IV, ง 43, requires that a reapportionment be made every 10 years.
[76] The 1962 reapportionment acts were approved on Apr. 7, 1962. The complaint was filed on Apr. 9, 1962.
[77] The District Court handed down its opinion on Nov. 28, 1962, and gave the Virginia General Assembly until Jan. 31, 1963, "to enact appropriate reapportionment laws." 213 F. Supp., at 585-586. The court stated that failing such action or an appeal to this Court, the plaintiffs might apply to it "for such further orders as may be required." Id., at 586.
[78] On Dec. 15, 1962, THE CHIEF JUSTICE granted a stay pending final disposition of the case in this Court.
[79] The Delaware Constitution, Art. XVI, ง 1, requires that amendments be approved by the necessary two-thirds vote in two successive General Assemblies.
[80] The District Court thus nailed the lid on the "box of time" in which everyone seemed to it "to be trapped." The lid was temporarily opened a crack on June 27, 1963, when MR. JUSTICE BRENNAN granted a stay of the injunction until disposition of the case by this Court. Since the Court states that "the delay inherent in following the state constitutional prescription for approval of constitutional amendments by two successive General Assemblies cannot be allowed to result in an impermissible deprivation of appellees' right to an adequate voice in the election of legislators to represent them," post. p. 711, the lid has presumably been slammed shut again.
[81] In New York and Colorado, this pattern of conduct has thus far been avoided. In the New York case (No. 20, post, p. 633), the District Court twice dismissed the complaint, once without reaching the merits, WMCA, Inc., v. Simon, 202 F. Supp. 741, and once, after this Court's remand following Baker v. Carr, supra, 370 U. S. 190, on the merits, 208 F. Supp. 368. In the Colorado case (No. 508, post, p. 713), the District Court first declined to interfere with a forthcoming election at which reapportionment measures were to be submitted to the voters, Lisco v. McNichols, 208 F. Supp. 471, and, after the election, upheld the apportionment provisions which had been adopted, 219 F. Supp. 922.

In view of the action which this Court now takes in both of these cases, there is little doubt that the legislatures of these two States will now be subjected to the same kind of pressures from the federal judiciary as have the other States.
[82] It is not mere fancy to suppose that in order to avoid problems of this sort, the Court may one day be tempted to hold that all state legislators must be elected in statewide elections.
[83] Ante, p. 579.
[84] Ante, pp. 579-580.
[85] Ante, p. 580.
[86] Ibid.
[87] Ibid.
[88] Ibid.
[89] Ante, pp. 576-577.
[90] Davis v. Mann, post, p. 691.
[91] Id., at 692.
[92] Lucas v. Forty-Fourth General Assembly, post, p. 736.
[93] Ante, p. 581.
[94] The Court does note that, in view of modern developments in transportation and communication, it finds "unconvincing" arguments based on a desire to insure representation of sparsely settled areas or to avoid districts so large that voters' access to their representatives is impaired. Ante, p. 580.
[*] All page references are to Cong. Globe, 39th Cong., 1st Sess. (1866).
[*] All page references are to Cong. Globe, 39th Cong., 1st Sess. (1866).